UNITED STATES of America, Plaintiff–Appellee,

v.

Roberto DOMINGUEZ–PRIETO, Defendant–Appellant.

No. 90–5781.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 3, 1990.

Decided Jan. 17, 1991.

John W. Gill, Jr., U.S. Atty., Steven H. Cook, Asst. U.S. Atty. (argued), Chattanooga, Tenn., for plaintiff-appellee.

John C. Cavett, Jr. (argued), Jahn & Jahn, Chattanooga, Tenn., for defendant-appellant.

Before MARTIN and NELSON, Circuit Judges, and BROWN, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

The Tennessee Public Service Commission and its officers are granted certain authority, including the authority to regulate motor carriers pursuant to Title 65 of the Tennessee Code. Among the duties, responsibilities, and authority granted to the Public Service Commission and its officers is the permission to inspect the contents of motor carriers in certain circumstances. The sole question before this Court is whether the Public Service Commission violated Roberto Dominguez–Prieto's fourth amendment rights when it entered the trailer portion of the truck he operated. We hold that the warrantless search did not violate Dominguez–Prieto's fourth amendment rights because it was made pursuant to the pervasively regulated business doctrine.

Among the legislation controlling the duties, responsibilities, and authority of the Public Service Commission is the following statute:

**Powers of public service commission.—** (a) The public service commission is vested with power and authority, and it shall be its duty to:

(1) License, supervise and regulate every *motor carrier* in this state, and to fix or approve the rates, fares, charges, classifications and rules and regulations pertaining thereto;

(2) Regulate and supervise the schedules, service and method of operation of such motor carriers;

(3) Require the filing of annual and other reports and any other data;

(4) Require that the accounts and records of such motor carriers be kept and maintained in a manner consistent with good accounting practice; and

(5) Supervise and regulate *motor carriers* in all matters affecting the relationship between such motor carriers and the public.

(b)(1) The commission shall designate enforcement officers charged with the duty of policing and enforcing the provisions of this part and such enforcement officer shall have authority to make arrests for violation of any of the provisions of this part, orders, decisions, rules and regulations of the commission, or any part or portion thereof, and to serve any notice, order or subpoena issued by any court, the commission, its secretary or any employee authorized to issue same, and to this end shall have full authority throughout the state.

. . . .

(3) *Such enforcement officers upon reasonable belief that any motor vehicle is being operated in violation of any provisions of this part, shall be authorized to require the driver thereof to:*

(A) Stop and exhibit the registration certificate issued for such vehicle;

(B) Submit to such enforcement officer for inspection any and all bills of lading, waybills, invoices or other evidences of the character of the lading being transported in such vehicle; and

(C) *Permit such officer to inspect the contents of such vehicle for the purpose of comparing same with bills of lading, waybills, invoices or other evidence of ownership or of transportation for compensation.*

(4) It shall be the further duty of such enforcement officers to impound any books, papers, bills of lading, waybills and invoices which would indicate the transportation service being performed is in violation of this part, subject to the further orders of the court having jurisdiction over the alleged violation.

(5) Such enforcement officers shall also have the above authority with respect to anyone who procures, aids or abets any motor carrier in violation of this part or in his failure to obey, observe or comply with this part, or any such order, decision, rule, regulation, direction or requirement of the commission, or any part or portion thereof.

. . . .

(d) In order to carry out the purposes of this part, the commission shall recognize for rate making and other regulatory purposes, the following as separate categories of motor carriers:

(1) Carriers of general commodities over regular routes;

(2) Carriers of household goods;

(3) Carriers of petroleum and other commodities requiring tank equipment;

(4) Carriers of passengers over regular routes; and

(5) Such other categories as the commission may by rule determine.

(3) Except as inconsistent with the express terms and provisions of this part, the commission shall have the same power as to and over rates, practices, regulation, control and operation of motor vehicles, to which this part is applicable, as the commission now has under present law, with reference to railroads and utilities; provided, that nothing in this subsection is intended to impose regulations upon contract carriers except insofar as the nature and character of their business so justify under the constitutions of Tennessee and the United States and the valid laws made pursuant thereto.

TENN.CODE ANN. § 65–15–106 (Supp.1990) (emphasis added).

On December 7, 1989, Dominguez–Prieto was driving a Kenworth tractor pulling a refrigerated trailer on Interstate 75 in Bradley County, Tennessee. Tennessee Public Service Commission Officer Reed Clayton pulled Dominguez–Prieto into a truck inspection station to make a routine examination for compliance with federal and state safety and hauling regulations. Officer Clayton had been a Public Service Commission employee for over three years at the time of this inspection and had performed around 3,000 such inspections.

Clayton noticed that, unlike the normal trucker, Dominguez–Prieto was visibly nervous and shaking. Clayton first asked for Dominguez–Prieto's bill of lading to which Dominguez–Prieto responded that he did not have one. Dominguez–Prieto told Officer Clayton that he was driving without a load from Houston, Texas to New York City. Officer Clayton had never before heard of anyone traveling with an empty tractor-trailer rig for more than three hours. A trip from Houston to New York would be approximately 1,600 miles. Officer Clayton then asked to examine Dominguez–Prieto's log book. Federal regulations require truckers to log travel time, departure and destination points, and points of change from duty to off-duty or vice versa. The regulations also require the trucker to keep this log book up-to-date. Dominguez–Prieto had not made any entry in his log book after December 1, 1989, six days prior to the inspection. In the thousand or more log books Officer

Clayton had examined in 1989, only twenty or so were out of date and none that he could recall were as out of date as Dominguez–Prieto's. Officer Clayton also noticed the supposedly empty rig was padlocked. He found this to be "extremely unusual" and could not recall ever seeing an empty trailer padlocked.

After completing the inspection, Officer Clayton wrote up a citation on the log book and he talked with his sergeant about Dominguez–Prieto. He then asked Dominguez–Prieto if he could look into the trailer. While not denying entry, Dominguez–Prieto responded that he did not have the keys. Officer Clayton also found this to be inconsistent with his experiences: truckers with locked trailers normally have the keys to the lock.

Officer Clayton again talked with his sergeant about Dominguez–Prieto. They then, along with other officers at the inspection station, attempted to cut Dominguez–Prieto's trailer lock with bolt cutters. Because of the unusually large size of the lock, the officers were unsuccessful in removing it. They then borrowed an acetylene torch from a mechanic working on the lot and removed the lock with the torch. Inside, the officers found boxes filled with over 200 kilograms of cocaine. They then arrested Dominguez–Prieto. In a subsequent search of the cab, the officers found $538,470 and the keys to the trailer lock.

The Supreme Court has recognized an exception to the warrant requirement for searches of "closely" or "pervasively" regulated industries. *See, e.g., Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). This exception to the warrant requirement has undergone significant development over the years. The Supreme Court most recently addressed the doctrine in *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

■ In *Burger,* the Court held that a warrantless inspection of a pervasively regulated business is reasonable when three criteria are present:

First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. ...

Second, the warrantless inspection must be "necessary to further [the] regulatory scheme." ...

[Third], "the statutes inspection program, in terms of certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." ... In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

*Burger,* 482 U.S. at 702-03, 107 S.Ct. at 2644 (citations omitted).

In *Burger,* the Court addressed the specific question of "whether the warrantless search of an automobile junkyard, conducted pursuant to a statute authorizing such a search, falls within the exception to the warrant requirement for administrative inspections of pervasively regulated industries." *Burger,* 482 U.S. at 693, 107 S.Ct. at 2639. The state statute at issue in *Burger* required junkyard operators to maintain certain records. It further provided as follows:

Upon request of an agent of the commissioner or any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit such agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

*Burger,* 482 U.S. at 694 n. 1, 107 S.Ct. at 2639 n. 1.

In order to enforce this statute, officers of the New York City Police Department went to the junkyard being operated by Burger. Burger was unable to produce the records required by the statute; the police then searched the business premises. That search revealed that Burger was in possession of stolen vehicles and parts. Burger was then arrested.

In addressing the legality of the police conduct, the Court in *Burger* concluded that "[s]earches made pursuant to [the state statute in question] *clearly* fall within the established exception to the warrant requirement for administrative inspections in 'closely regulated businesses.'" *Burger*, 482 U.S. at 703, 107 S.Ct. at 2644 (emphasis added).

■ Applying the *Burger* analysis to the instant case reveals that the search of the trailer was proper.

The federal regulations governing the commercial trucking industry are extensive. Regulations cover driver's qualifications, motor vehicles' parts and accessories, reporting of accidents, drivers' hours of service, inspection, repair and maintenance of motor vehicles, recording of itineraries, transportation of hazardous materials, and other safety issues. 49 C.F.R. §§ 100–399. Not only is there comprehensive regulation of the common carriers in the trucking industry by the federal government, but they are also comprehensively regulated by most, if not all, states including Tennessee. *See* TENN.CODE ANN. §§ 65–15–101 through 65–15–126 (1982 and 1990 Supp.) This legislation regulates and controls everything from rates which may be charged, TENN. CODE ANN. § 65–15–119, to the transportation of nuclear fuel, TENN.CODE ANN. § 65–15–126. In view of this extensive state and federal regulation, we find the common carriers in the trucking industry to be a pervasively regulated business. *Cf. Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (coal mining pervasively regulated); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms pervasively regulated); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor pervasively regulated); *United States v. Acklen*, 690 F.2d 70 (6th Cir.1982) (pharmacies pervasively regulated); *Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693 (6th Cir.1979) (sand and gravel industry pervasively regulated), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980). Accordingly, the focus of the inquiry turns on whether the three criteria set out by *Burger* are present.

The first of the three *Burger* elements is met where there is "a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Burger*, 482 U.S. at 702, 107 S.Ct. at 2644. In *Burger*, the Court held that "the state has a substantial interest in regulating the vehicle-dismantling and automobile-junkyard industry because motor vehicle theft has increased in the State and because the problem of theft is associated with this industry." *Burger*, 482 U.S. at 708, 107 S.Ct. at 2646–47.

With respect to the regulation of common carriers in the trucking industry, the substantial interests of the government are evident. There is a clear need to place restrictions on what commodities may be transported and what type of vehicles may be used to transport those commodities. For example, the state has a substantial interest in prohibiting the transportation of flammable or hazardous materials absent certain safety precautions including vehicle design and placarding. *See, e.g.,* 49 C.F.R. §§ 177.800 through 177.876. Likewise, the safe operation of large commercial vehicles is critical to the welfare of the motoring public.

The second *Burger* element requires an assessment of whether "the warrantless inspections [are] 'necessary to further [the] regulatory scheme.'" *Burger*, 482 U.S. at 702, 107 S.Ct. at 2644 (citations omitted). In *Burger*, the Court held that the warrantless inspections of junkyards were necessary to further the regulatory scheme because they were a credible deterrent for the receiving of and marketing in stolen goods, and they facilitated frequent inspections. *Burger*, 482 U.S. at at 710, 107 S.Ct. at 2648. Imposing a warrant requirement would have frustrated both of these goals. The Court also noted that a warrant requirement would interfere with the purpose of the statute, "[b]ecause stolen cars and parts often pass quickly through an automobile junkyard." *Burger*, 482 U.S. at 710, 107 S.Ct. at 2648.

As was the case in *Burger*, warrantless inspections are critical to the regulatory scheme in question here. If the Tennessee Public Service Commission is to be successful in regulating or controlling common carriers in the trucking industry and the types of cargo they transport, they must be able to check the cargo frequently. Like the stolen cars and automobile parts which pass quickly through an automobile junkyard, trucks pass quickly through states and out of the jurisdictions of the enforcement agencies; the facts presented here in support of warrantless inspections are more compelling than those present in *Burger*.

The third factor—that the statute's inspection program provides a constitutionally adequate substitute for a warrant—was met in *Burger* for three reasons: (1) Under the New York statute in question "the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute;" (2) the statute "sets forth the scope of the inspection and ... notifies the operator as to who is authorized to conduct an inspection;" and (3) the "'time, place, and scope' of the inspection is limited." *Burger*, 482 U.S. at 711, 107 S.Ct. at 2648 (citations omitted).

> The statute at issue in *Burger* provided in relevant part as follows:
>
> Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

*Burger*, 482 U.S. at 694 n. 1, 107 S.Ct. at 2639 n. 1.

In this case, the most pertinent part of the Tennessee statute in question provides as follows:

> Such enforcement officers upon reasonable belief that any motor vehicle is being operated in violation of any provi-

sions of this part, shall be authorized to require the driver thereof to:
>
> ....
>
> (C) Permit such officer to inspect the contents of such vehicle for the purpose of comparing same with bills of lading, waybills, invoices or other evidence of ownership or of transportation for compensation.

TENN.CODE ANN. § 65–15–106 (Supp.1990). When this statutory inspection program is analyzed under the *Burger* test or compared to the inspection statute held to be constitutional in *Burger*, it becomes apparent that the third element of the test is met. In *Burger*, the statutory scheme permitted an inspection by "any police officer." The inspection scheme in the instant case limits the authority to conduct an inspection to Public Service Commission officers. *See* TENN.CODE ANN. § 65–15–106(b)(1); *see also Burger*, 482 U.S. at 711, 107 S.Ct. at 2648 (the statute "notifies the operator as to who is authorized to conduct an investigation").

Perhaps most important in the comparison with *Burger* is the fact that the inspection scheme in *Burger* required no level of suspicion while the Tennessee inspection scheme requires a "reasonable belief" that a violation is occurring.

The inspection scheme here also restricts the officer's discretion by limiting his authority to investigate "motor vehicle[s] being operated in violation of any provision *of this part*." (emphasis added). TENN.CODE ANN. § 65–15–106 sets forth the powers of the Public Service Commission and its officers and specifically limits those powers to the regulation, and related conduct, relative to motor carriers. The term "motor carrier," in turn, as defined in TENN.CODE ANN. § 65–15–102(3) is restricted to "the transportation of persons or property or both or for providing or furnishing such transportation service, *for hire* as a common carrier." (emphasis added). The statute then exempts various types of vehicles (*e.g.*, school and church vehicles and ambulances and hearses) from inspection pursuant to TENN.CODE ANN. § 65–15–106(b)(3)—but not from safety in-

spections pursuant to Tenn.Code Ann. § 65–15–113. *See Burger*, 482 U.S. at 711, 107 S.Ct. at 2648 (scope of inspection is limited).

The only way in which the statutory inspection scheme reviewed in *Burger* is narrower than the inspection scheme at issue here is the limitation on time. The statute reviewed in *Burger* allowed inspections only during the regular and usual business hours. *See Burger*, 482 U.S. at 711, 107 S.Ct. at 2648. The statutory scheme at issue here does not limit the time frame within which such inspections are permitted. Such a limitation would, of course, render the entire inspection scheme unworkable and meaningless. Trucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time. Thus, this difference between the statutes is inconsequential.

Finally, it is clear that Officer Clayton's sergeant, the Tennessee Public Service Commission Officer who directed the search, had the required "reasonable belief" to conduct the search pursuant to Tenn.Code Ann. § 65–15–106. Although our review of "reasonable belief" is objectively made, Officer Clayton's perceptions are essential to our evaluation. Officer Clayton was a seasoned investigator at the time of the examination of Dominguez–Prieto's trailer. The combination of his many insights enabled him to determine that something was amiss with Dominguez–Prieto's assertion that his trailer was empty. Clayton recognized the peculiarity of a truck traveling 1,593 miles without cargo, an extremely expensive venture. He noted the irregular manner in which Dominguez–Prieto kept his log book. The unusual presence of a padlock on the supposedly empty rig added to his suspicions, as did Dominguez–Prieto's assertion that he had no key to the lock. This array of oddities was combined with Dominguez–Prieto's visible nervousness to create a well-founded suspicion that Dominguez–Prieto may be transporting illegal cargo. Officer Clayton transferred this information to his sergeant. Given Officer Clayton's many observations, we find Officer

Clayton's sergeant met the standard of reasonable belief required under the Tennessee regulatory scheme before directing the search of Dominguez–Prieto's trailer.

Because of the foregoing reasons, we hold the warrantless search did not violate Dominguez–Prieto's fourth amendment rights and affirm the judgment of the district court.