STATE OF NORTH CAROLINA v. JIMMY RAY NOBLES

No. 913SC627

(Filed 20 October 1992)

**Searches and Seizures § 1 (NCI3d)— fish dealership—warrantless administrative search—constitutional**

The trial court erred by dismissing a misdemeanor citation of defendant for refusal to allow inspection of a licensed fish dealership on the grounds that N.C.G.S. § 113-136(k) allows unreasonable warrantless searches and seizures in violation of the Fourth Amendment. The trial court erred in finding N.C.G.S. § 113-136(k) unconstitutional on its face because the coastal fishing industry is a pervasively regulated industry in N.C.; the maintenance, preservation, and protection of N.C.'s marine resources are substantial government interests; the transient and disposable nature of fish subject to regulation dictate that an effective inspection scheme, including warrantless administrative searches, is necessary to further the government's interests; the commercial fisher has a low expectation of privacy and has constructive notice of periodic inspections; and the statutory section authorizing the inspections is limited sufficiently as to time, place, and scope.

**Am Jur 2d, Searches and Seizures §§ 15, 19.**

Judge GREENE dissenting.

APPEAL by the State from order entered 14 February 1991 by Judge William C. Griffin, Jr., in PITT County Superior Court. Heard in the Court of Appeals 18 February 1992.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General J. Allen Jernigan, for the State appellant.*

*Pritchett, Cooke & Burch, by Lloyd C. Smith, Jr., and David J. Irvine, Jr., for defendant appellee.*

COZORT, Judge.

On 6 March 1990, Jimmy Ray Nobles was charged with refusing to allow an inspection of a licensed fish dealership, "West End Seafood," in Greenville, North Carolina, pursuant to N.C. Gen. Stat. § 113-136(k). When defendant refused to allow two officers to in-

spect fish being sold on the premises, the officers subsequently obtained a search warrant and issued a misdemeanor citation to defendant for the refusal. The trial judge granted defendant's motion to dismiss the charge on the grounds that § 113-136(k) allows unreasonable warrantless searches and seizures in violation of the Fourth Amendment. The State appeals.

The only issue presented is whether the trial court decided correctly that N.C. Gen. Stat. § 113-136(k) on its face violates the constitutional right to be free from unreasonable searches and seizures by permitting warrantless administrative searches of commercial premises. We find the statutory provision in question does not violate the Fourth Amendment and reverse the trial court's order striking down the subsection in its entirety.

The statutory section authorizing the warrantless inspections reads as follows:

It is unlawful to refuse to exhibit upon request by any inspector, protector, or other law enforcement officer any item required to be carried by any law or rule as to which inspectors or protectors have enforcement jurisdiction. The items that must be exhibited include boating safety or other equipment or any license, permit, tax receipt, certificate, or identification. *It is unlawful to refuse to allow inspectors, protectors, or other law enforcement officers to inspect weapons, equipment, fish, or wildlife that the officer reasonably believes to be possessed incident to an activity regulated by any law or rule as to which inspectors and protectors have enforcement jurisdiction.*

N.C. Gen. Stat. § 113-136(k) (Cum. Supp. 1991) (emphasis added). We note at the outset that although the trial court's order struck down N.C. Gen. Stat. § 113-136(k) in its entirety, we are concerned only with the latter portion of the subsection which is highlighted above. The parties agree that the initial provision of the statute making it unlawful to refuse to exhibit licenses, permits, etc., is not the primary source of contention, since this provision was not before the trial court on defendant's motion to dismiss. We therefore have narrowed our review to the emphasized section, in considering only the constitutionality of the statute as it relates to the inspection of fish or fishing equipment possessed incident to regulation. Our inquiry concerns inspections of fish at various locations, including boats, docks, fish houses, and other commercial dealerships.

STATE v. NOBLES

[107 N.C. App. 627 (1992)]

No evidence has been presented, nor are there arguments before this Court, challenging the constitutionality of the statute as it governs the inspection of weapons or wildlife, since those items do not fall immediately within the inspection powers of the Marine Fisheries Commission. Our analysis is therefore limited to the question of whether a warrantless inspection of a fish dealership pursuant to the above statute violates the Fourth Amendment to the United States Constitution.

The Fourth Amendment protects individuals from unreasonable searches and seizures. The purpose of the amendment is to impose a requirement of "reasonableness" upon the exercise of discretion by government officials in order "to safeguard the privacy and security of individuals against arbitrary invasions." *Camara v. Municipal Court*, 387 U.S. 523, 528, 18 L.Ed.2d 930, 935 (1967). The Fourth Amendment applies to administrative inspections of private commercial property. *See v. City of Seattle*, 387 U.S. 541, 546, 18 L.Ed.2d 943, 948 (1967). A government search of private property without consent is considered a violation of the Fourth Amendment unless it is conducted pursuant to a valid search warrant or falls within one of a few narrowly defined exceptions. *Camara*, 387 U.S. at 528-29, 18 L.Ed.2d at 935. Reviewing courts must apply a case-by-case analysis when determining whether a regulatory scheme including warrantless inspections is reasonable under the Fourth Amendment. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 321, 56 L.Ed.2d 305, 317 (1978). What is reasonable depends on the expectation of privacy in the area searched, the importance of the governmental interest justifying the search, and the degree to which the authority given for the search is tailored to that interest in order to minimize intrusion. *Donovan v. Dewey*, 452 U.S. 594, 69 L.Ed.2d 262 (1981). Warrantless inspections of commercial property may be unreasonable if they are unnecessary to further important governmental interests, or if their occurrence is so random, infrequent, or unpredictable that the owner has no real expectation that the property will from time to time be inspected. *Id.* at 599, 69 L.Ed.2d at 269. Where, however, a regulatory scheme does protect business owners from being exposed to the "almost unbridled discretion [of] executive and administrative officers, particularly those in the field, as to when to search and whom to search," *Marshall*, 436 U.S. at 323, 56 L.Ed.2d at 317-18, statutes authorizing warrantless administrative searches may pass constitutional muster.

STATE v. NOBLES

[107 N.C. App. 627 (1992)]

As a threshold matter, it is important to note "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's 'home." *Donovan*, 452 U.S. at 598-99, 69 L.Ed.2d at 269. An individual engaged in an industry that is pervasively regulated by the government or which has been traditionally the target of close scrutiny is generally considered to be on notice that periodic inspections will occur and, consequently, has no reasonable expectation of privacy in the areas where he knows those inspections will occur. *Id.* at 606, 69 L.Ed.2d at 273-74. Several cases demonstrate the exemptions from the warrant requirement: in *Donovan*, 452 U.S. 594, 69 L.Ed.2d 262, the Supreme Court upheld warrantless inspections of stone quarries authorized by the Federal Mine and Safety Act; in *United States v. Biswell*, 406 U.S. 311, 32 L.Ed.2d 87 (1972), warrantless inspections of firearms in pawnshops were upheld pursuant to the Gun Control Act; and in *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 25 L.Ed.2d 60 (1970), warrantless inspections of businesses holding alcoholic beverage licenses were found to be reasonable.

Defendant argues the coastal fishing industry is not closely regulated in our state. We disagree. Few industries are as "pervasively regulated" as the commercial fishing business. The fishing industry has been the subject of close regulation "almost since the founding of the Republic." *Lovgren v. Byrne*, 787 F.2d 857, 865 (3d Cir. 1986). Government regulation of the fishing industry has been ongoing since at least 1793 when licenses were required for vessels to engage in cod and mackerel fishing. *See* Act of Feb. 18, 1793, 1 Stat. 305. The same may be said regarding regulation of the fishing industry in our state. *See State v. Sermons*, 169 N.C. 285, 84 S.E. 337 (1915); N.C. Gen. Stat. § 113-136 (Session Laws 1915, Chapter 84, Section 6). Today, it is well recognized that the coastal fishing industry is "closely regulated" because of the pervasive regulation within the industry and the substantial government interests implicated in managing and conserving fishery resources. *Tart v. Massachusetts*, 949 F.2d 490 (1st Cir. 1991); *Lovgren v. Byrne*, 787 F.2d 857 (3d Cir. 1986); *United States v. Kaiyo Maru*, 699 F.2d 989 (9th Cir. 1983). We find the business operated by defendant, a wholesale fish dealership, to be closely regulated in our state for purposes of evaluating the expectation of privacy involved in determining whether a Fourth Amendment violation has occurred.

STATE v. NOBLES

[107 N.C. App. 627 (1992)]

In *New York v. Burger*, 482 U.S. 691, 96 L.Ed.2d 601 (1987), the United States Supreme Court articulated a specific test to be applied when deciding the propriety of administrative inspections of pervasively or closely regulated industries. The Court, prefacing the test, explained, "where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." *Id.* at 702, 96 L.Ed.2d at 613-14.

> This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. . . .
>
> Second, the warrantless inspections must be "necessary to further [the] regulatory scheme.". . . .
>
> Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

*Id.* at 702-03, 96 L.Ed.2d at 614 (citations omitted).

Here, application of the *Burger* analysis reveals that N.C. Gen. Stat. § 113-136(k) and the regulatory scheme adopted thereunder meet all three prongs of the test necessary to fall within the exception to the warrant requirement for administrative inspections of closely regulated businesses. The first two prongs of the *Burger* test are satisfied easily. According to the North Carolina Fisheries Rules for Coastal Waters, the Marine Fisheries Division

> is charged with the stewardship of the marine and estuarine resources of the State of North Carolina and is responsible for the management of all marine and estuarine resources. This responsibility includes the administration and enforcement of all statutes and rules governing commercial and recreational fishing in coastal waters, the development and

improvement of the cultivation and harvesting of shellfish, and submerged land claims in North Carolina.

\* \* \* \*

. . . The rules are designed to carry out, in part, the duty of the Division of Marine Fisheries to maintain, preserve, protect, and develop all the marine and estuarine resources of the State.

N.C. Admin. Code tit. 15A, r. 3H.0002 (a) and (d) (1991). Fish are a valuable natural and economic resource for which stringent governmental protection is essential. We find the maintenance, preservation, protection and development of our state's marine resources serve as substantial public and important state interests to support fishing industry regulation. These interests are in turn furthered by a regulatory scheme which includes warrantless inspections. Warrantless inspections of marine fish are necessary for many reasons. First, fish are highly perishable products which are extracted from coastal waters and then injected rapidly into the stream of commerce by being transported or sold. Due to such high perishability and portability, the time during which inspectors may check fish is limited. While a fisheries inspector is obtaining a warrant, fish dealers may dispose of fish which are possessed in violation of size and quantity limitations. Secondly, as a practical matter, "[t]he logistical problems in establishing a successful inspection program requiring warrants are insurmountable" in the fishing industry. *Kaiyo Maru*, 699 F.2d at 996. Fishing is a highly variable activity, and with respect to fish being possessed on boats, at docks, in trucks, and even in markets, procuring a warrant is often impractical. Fishing itself is an ongoing process which fluctuates based on variables such as the weather. It follows then, that the transportation of fish and the eventual arrival of fish at wholesale and retail fish dealerships also varies. Requiring a warrant to inspect boats, docks, trucks, and for purposes of this case, the fish houses, would frustrate the effectiveness of the inspections.

Unlike *See v. City of Seattle*, . . . a case involving housing code violations, and *Marshall v. Barlow's Inc.*, . . . a case involving OSHA inspections, the government in this case will rarely have time to obtain a warrant before the status quo is changed. The fish are highly perishable and even in the best of circumstance are unlikely to remain on the docks for any length of time. Moreover, it would often be difficult to

obtain a warrant in advance since the purpose of inspection will frequently be limited to obtaining information, not seeking out wrongdoers.

*Lovgren*, 787 F.2d at 866. Lastly, imposing a warrant requirement renders the inspections meaningless. If fishermen or fish dealers have knowledge of upcoming checks, the probability of violations would be low, since violators would circumvent the law by concealing unlawful activity. "[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential." *Biswell*, 406 U.S. at 316, 32 L.Ed.2d at 92. Unannounced inspections ferret and discipline those entities which disobey the law. Warrantless inspections thus are needed to provide close regulation of the fishing industry—regulation which is necessary to promote our state's interests in preserving a natural resource. A warrant requirement would impede the specific enforcement needs of the statutory scheme.

We now reach the third prong of the *Burger* test, which measures whether the statute allowing warrantless inspections is structured in order to limit the discretion of the inspecting officers, thus providing a " 'constitutionally adequate substitute for a warrant.' " *Burger*, 482 U.S. at 703, 96 L.Ed.2d at 614 (quoting *Donovan*, 452 U.S. 594, 600, 69 L.Ed.2d 262, 270). To meet the third prong of the test, the statutory provision must (1) notify property owners that they " 'will be subject to periodic inspections undertaken for specific purposes,' " *id.*, and (2) carefully limit official discretion as to the time, place, and scope of the inspections. *Biswell*, 406 U.S. at 315, 32 L.Ed.2d at 92. After analyzing the statutory framework in light of current law, we are of the opinion the statute constitutes an adequate substitute for a warrant.

First, we cannot say those who hold commercial fishing dealership licenses are completely unaware of the possibility of periodic inspections of their products and equipment. Participation in a closely regulated business in and of itself places a fish dealer on notice that inspections are certain to occur. The cases recognize this type of constructive notice in these pervasively regulated industries. For instance, in *Biswell*, the Supreme Court found warrantless inspections of firearms pursuant to § 923 of the Gun Control Act of 1968 not violative of the Fourth Amendment. The statute gave treasury agents the authority to enter the premises of any firearms dealer during business hours for the purpose of inspecting or ex-

amining any records or documents required to be kept and any firearms or ammunition kept or stored by such dealer. *Id.* at 311-12, 32 L.Ed.2d at 90. In finding the statute valid, the Court stated:

> [I]nspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection.

*Id.* at 316, 32 L.Ed.2d at 92-93. The same rationale was applied in *Donovan* where the Court upheld inspections of stone quarries under § 103(a) of the Federal Mine Safety and Health Act of 1977. The *Donovan* Court indicated that warrants may not be necessary when searches are needed to further the regulatory scheme, and the "owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan*, 452 U.S. at 600, 69 L.Ed.2d at 270. Similarly, in the present case, the statute and its surrounding regulatory scheme put the commercial fish dealer on notice concerning the inevitability of inspections. Courts have examined other portions of the pertinent regulatory scheme to determine whether or not the provision adopting warrantless inspections gives the individual subject to inspection proper notice. *See, i.e., Donovan*, 452 U.S. at 604-05, 69 L.Ed.2d at 272. In addition to the subsection at issue, other provisions within the regulatory framework of the subchapter governing the conservation of marine and estuarine resources specify that licensed commercial fish dealers will be subject to inspections. For example, the statutory section which enumerates the prerequisites for obtaining a fish dealer's license notifies the dealer that his or her business will be subject to periodic inspections of records.

> Every fish dealer subject to the licensing provisions of this section must secure a separate license or set of licenses for each established location. Where a dealer does not have an established location for transacting the fisheries business within the State, the license application must be denied unless the applicant satisfies the Secretary that his residence, or some other office or address, within the State, is a suitable substitute for an established location and that records kept in connection

with licensing, sale, and tax requirements *will be available for inspection when necessary.*

N.C. Gen. Stat. § 113-156(d) (Cum. Supp. 1991) (emphasis added). These statutes and the corresponding regulations implemented by the Marine Fisheries Commission are part of the public record and are also published in the Fisheries Rules for North Carolina Coastal Waters. These provisions give adequate notice to fish dealers that their premises are subject to inspection.

Additionally, commercial fish dealers, by procuring a fish dealer's license, impliedly consent to such inspections. In a case similar to the case at bar, a court upheld the warrantless search of a wholesale fish dealer's facility. That court stated:

The central precept to be found in *Colonnade, Biswell,* and *Donovan* is that, in undertaking to engage in a highly regulated and licensed enterprise, the entrepreneur thereby consents to the array of regulations associated with the trade; that is, its burden as well as its benefits. The businessman engaged in such a trade cannot but reasonably anticipate that his establishment is subject to periodic inspections undertaken to further the regulatory objective.

*People v. Harbor Hut Restaurant,* 148 Cal. App. 3d 1151, 1154-55, 196 Cal. Rptr. 7, 9 (1983). Implied consent was also a factor in upholding warrantless inspections of fishing vessels in *Tallman v. Dep't of Natural Resources,* 421 Mich. 585, 365 N.W.2d 724 (1984). The *Tallman* court determined that licenses issued to the commercial fishermen gave them direct notice that warrantless searches of business premises could be performed at any time as a condition of receiving the license. The court noted, "Neither commercial fishers nor other business people can be required to surrender their constitutionally protected rights in exchange for the privilege of doing business. However, anyone engaged in the commercial fishing business must be prepared to submit to reasonable regulations and, consequently, to diminished expectations of privacy." *Tallman,* 421 Mich. at 629, 365 N.W.2d at 744 (citation omitted).

The courts of our state have also acknowledged that acceptance of certain licenses creates an implied consent to inspections where pervasively regulated industries are concerned. In *Greensboro Elks Lodge v. N.C. Bd. of Alcoholic Control,* 27 N.C. App. 594, 603, 220 S.E.2d 106, 112 (1975), *cert. denied,* 289 N.C. 296, 222 S.E.2d

696 (1976), this Court held "that by seeking a permit, petitioner waived its Fourth Amendment right to the limited extent of inspection incident enforcement of State A.B.C. regulations." This holding was based on a recognition of the implied consent doctrine in our state. The alcoholic beverage statute which authorizes inspection of licensed premises permits officers

> to investigate the operation of each licensed premises for which an ABC permit has been issued, to make inspections that include viewing the entire premises, and to examine the books and records of the permittee. The inspection authorized by this section may be made at any time it reasonably appears that someone is on the premises.

N.C. Gen. Stat. § 18B-502(a) (1989). The statute provides for the revocation or suspension of an A.B.C. permit where a permittee refuses inspection. N.C. Gen. Stat. § 18B-502(b) (1989). Any resistance of an inspection is a misdemeanor where a permittee obstructs an officer's attempt to make a lawful inspection. *Id.* The Court in *Greensboro Elks Lodge* found the licensed dealers to have impliedly consented to inspection by looking to other licensing statutes as support. For example, our state has adopted a motor vehicles statute in which automobile drivers give implied consent to a chemical analysis when charged with an implied-consent offense. N.C. Gen. Stat. § 20-16.2 (Cum. Supp. 1991). *See also* N.C. Gen. Stat. § 20-16 (Driver's License Suspension).

The commercial fish licensing statute and its provision for inspection are comparable. The inspection provision allows inspections day or night and carries a punishment for any refusal to inspect. "Indeed the expectation of finding the game warden looking over one's shoulder at the catch is virtually as old as fishing itself." *Lovgren*, 787 F.2d at 865. We do not find that an implied consent to search or inspect certain items or areas automatically attaches with an issuance of any given license in our state. However, the similarity of a commercial fishing license to an alcoholic beverage license compels us to find implied consent in this instance. We emphasize the final holding of this case does not rely solely on a consent to search or waiver theory. Consent is significant as evidence that commercially licensed fish dealers are on notice that periodic inspections can be expected. The defendant appellee holds a commercial fish dealer's license and has knowledge that periodic inspections are a regular component of the enforcement scheme.

STATE v. NOBLES

[107 N.C. App. 627 (1992)]

Resultingly, as in *Greensboro Elks Lodge*, he agreed to the inspections by accepting the rights and responsibilities which necessarily follow with the acquisition of the license.

We now turn to the final inquiry with respect to the *Burger* test. Warrantless searches of commercial property are permissible where the benefits of the warrant process would be minimal since inspections are conducted within "the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope." *Biswell*, 406 U.S. at 315, 32 L.Ed.2d at 92. Defendant appellee argues that because N.C. Gen. Stat. § 113-136(k) does not circumscribe any limitation as to when the warrantless searches must occur, the statute is unconstitutional. In the *Burger* case, the New York statute authorized police officers to inspect automobile junkyards " 'during [the] regular and usual business hours.' " *Burger*, 482 U.S. at 711, 96 L.Ed.2d at 619. The statutory provision in the present case has no such time limitation. Although N.C. Gen. Stat. § 113-136 does not state explicitly a time limitation dictating when inspections may occur, this omission is not fatal. A careful reading of *Burger* discloses that the time, place, and scope limitations are only *factors* to consider in evaluating the constitutionality of the statute; they are not dispositive. A footnote in the case states:

> Respondent contends that § 415-a5 is unconstitutional because it fails to limit the number of searches that may be conducted of a particular business during any given period. . . . While such limitations, or the absence thereof, are a factor in an analysis of the adequacy of a particular statute, they are not determinative of the result so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers. Indeed, we have approved statutes authorizing warrantless inspections even when such statutes did not establish a fixed number of inspections for a particular time period. And we have suggested that, in some situations, inspections must be conducted frequently to achieve the purposes of the statutory scheme.

*Burger*, 482 U.S. at 711, 96 L.Ed.2d at 619 n.21 (citations omitted).

Courts reviewing statutes allowing warrantless searches lacking time constraints on the searches have consistently employed the "factor" analysis and have upheld certain statutes which otherwise limit officers' discretion. For instance, in *United States v.*

*Dominguez-Prieto*, 923 F.2d 464, 466 (6th Cir. 1991), *cert. denied*, --- U.S. ---, 114 L.Ed.2d 468 (1991), the court upheld a statute which allowed enforcement officers to stop motor vehicles and to inspect the contents of motor vehicles "upon reasonable belief that any motor vehicle is being operated in violation of any provisions of this part . . . ." The statute in *Dominguez-Prieto* specifically gave Tennessee Public Service Commission officers the authority to "[l]icense, supervise and regulate every *motor carrier* in [the] state," and included the power to inspect contents of the trucks for purposes of comparing bills of lading with invoices or other evidence of ownership or of transportation for compensation. *Id.* at 465-66. In upholding the search provision, the court indicated the only differentiation between the statutory inspection scheme in *Burger* and the Tennessee statute was the limitation on time. The *Dominguez-Prieto* court reasoned:

> The statutory scheme at issue here does not limit the time frame within which such inspections are permitted. Such a limitation would, of course, render the entire inspection scheme unworkable and meaningless. Trucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time. Thus, this difference between the statutes is inconsequential.

*Id.* at 470. Courts which have examined statutes similar to the one in the present case have upheld such statutes despite the failure to impose explicit restrictions as to times when inspections may occur. In *Lovgren*, the court found the Magnuson Act provision authorizing warrantless inspections of fishing vessels to be carefully tailored since the inspections were "limited to only those times when and those places where groundfish may be found." *Lovgren*, 787 F.2d at 867. Similarly, in *Tart v. Massachusetts*, 949 F.2d 490 (1st Cir. 1991), the court concluded that a statute authorizing warrantless documentation checks of commercial fishing vessels need not contain an explicit "checklist" of time and place limitations for conducting documentation inspections. The court in *Tart* considered the lack of time limitations in the context of the entire regulatory scheme applicable to the commercial fishing industry and found "[t]he lack of explicit constraints on the officers' discretion is not determinative." *Tart*, 949 F.2d at 499.

Limitations as to frequency and time, then, are only factors to consider in the test. Because the statute in the case at bar

STATE v. NOBLES

[107 N.C. App. 627 (1992)]

governs all aspects of the commercial fishing process — on the water, at the dockside, in transit and in the marketplace — we do not agree that a failure to delineate times for searches automatically dooms the entire statute. Here, time limits on inspections, as in *Dominguez-Prieto*, would not be feasible particularly because of the ongoing variable activities of commercial fishing. As the other cases involving commercial fishing inspections indicate, the statute allows inspectors the flexibility and convenience to inspect fish while they are being held at varying stages of the commercial fishing process. We adopt the reasoning of those cases. Defendant appellee contends nothing in the statute limits the officers' discretion in that officers may target certain individuals or businesses for frequent and unjustified spot checks. Whether such an application of the statute is unconstitutional is not before us; defendant has challenged the statute solely on its face. No evidence is before the Court to suggest defendant appellee was or would become a "target" of fish inspectors. If such were to happen, any challenge to the statute would be grounded on the unreasonableness of the provision *in its application, not on its face*. We therefore find the statute's failure to specify time limits is not constitutionally fatal.

As to limitations on what places may be searched, the section at issue is sufficiently limited. Searches may occur only in places where fish are "possessed incident to an activity regulated by any law or rule as to which inspectors and protectors have enforcement jurisdiction." N.C. Gen. Stat. § 113-136(k). These areas would include fishing vessels, docks, trucks, and markets. The inspections are limited by the following subsection which provides, "[n]othing in this section authorizes searches within the curtilage of a dwelling or of the living quarters of a vessel in contravention of constitutional prohibitions against unreasonable searches and seizures." N.C. Gen. Stat. § 113-136(l). The higher expectation of privacy as to private areas is therefore preserved by limiting the places where fisheries commission officers may conduct the searches.

Finally, the statute is limited in its scope. The plain language of the statute limits inspecting officers to inspecting fish "that the officer reasonably believes" are possessed incident to a regulated activity. If the officer reasonably believes the fish are possessed for commercial sale, then he or she has the ability to inspect without a warrant. The reasonable belief requirement imposes a limitation as to what fish may be inspected. Any inspection without a reasonable belief would be violative of the protections against unreasonable

searches. And, the statute is also limited in that only officers with the proper jurisdiction, the Marine Fisheries inspectors, may inspect. These limitations as to scope, coupled with the other limitations in the statute as a whole, constrain "the exercise of official discretion to the minimum enforcement measures required to assure reasonable compliance" with the regulations in the commercial fishing industry. *Tart*, at 499.

We further find that the obtaining of a warrant prior to inspection would not afford any extra protection to a participant in the commercial fishing industry. Other courts interpreting similar statutes have agreed. In *State v. Erickson*, 101 Wis.2d 224, 303 N.W.2d 850 (1981), the court found that the warrantless search by conservation wardens of a truck being loaded behind a wholesale fish market was presumptively reasonable. The statute in that case authorized the inspection of "buildings, structures, vessels or vehicles, all pertinent equipment including nets . . . and any fish stored, processed, packed or held in the places to be inspected." *Erickson*, 101 Wis.2d at 226-27 n.3, 303 N.W.2d at 851 (quoting Wis. Stat. 29.33(6) ). The court in *Erickson* took into consideration the implied consent doctrine and stated: "By accepting a commercial fishing license or permit from the state, . . . the holder effectively consents to spot inspections by state officials." *Id.* at 229, 303 N.W.2d at 852. The court went on to conclude that "a warrant requirement would only marginally increase a commercial fisherman's privacy and security from governmental interference. Balancing the competing interests, we conclude that the security interest of licensed commercial fisherman must be subordinate to the enforcement needs of the state." *Id.*

In *Tallman*, 421 Mich. 585, 365 N.W.2d 724, the court upheld a commercial fishing statute which permitted inspection of a licensee's "fishing operations." *Tallman*, 421 Mich. at 630, 365 N.W.2d at 749. The *Tallman* court applied a "balancing of interests" test, an expanded version of the *Burger* test, including an examination of implied consent. The court found the statute to fall within the warrant exception for pervasively regulated industries. Another case, *People v. Harbor Hut Restaurant*, 148 Cal. App. 3d 1151, 196 Cal. Rptr. 7 (1983), upheld a warrantless inspection of a walk-in freezer for the purpose of verifying information found in the business records of a wholesale fish dealership. The court in *Harbor Hut* found the inspection statutes, "when viewed in their totality and in light of the laws governing the regulation of commercial fishing,

lead to the inescapable conclusion that inspections by officials . . . are sufficiently circumscribed so as to satisfy the requirements of the Fourth Amendment." *Harbor Hut*, 148 Cal. App. 3d at 1156, 196 Cal. Rptr. at 10. In *State v. Westside Fish Co.*, 31 Or. App. 299, 570 P.2d 401 (1977), the court upheld a statute authorizing inspection of licensed wholesale fish dealers' premises for the purpose of enforcing the commercial fishing laws. Although the statutes involved in the cases above are not identical to the statute at issue here, the principles articulated in these cases are applicable. The basic recurring theme is that where warrantless searches relating to the fishing industry are at issue, courts must balance the public interest against the privacy interests of commercial fishers in deciding the reasonableness of warrantless inspections. Where the *Burger* test is satisfied and the public interest outweighs a minimal intrusion, as in the case at bar, the statute does not violate the Fourth Amendment.

In sum, we conclude: (1) the coastal fishing industry is a pervasively regulated industry in our state; (2) the maintenance, preservation, and protection of our state's marine resources are substantial government interests; (3) the transient and disposable nature of fish subject to regulation dictate that an effective inspection scheme, including warrantless administrative searches, is necessary to further the government's interests; (4) the commercial fisher has a low expectation of privacy and has constructive notice of periodic inspections; and (5) the statutory section authorizing the inspections is limited sufficiently as to time, place, and scope. After balancing carefully the interests of the government against the interests of the privacy of a licensed commercial fish dealer, we hold that the trial court erred in finding N.C. Gen. Stat. § 113-136(k) unconstitutional on its face. The order is

Reversed.

Judge JOHNSON concurs.

Judge GREENE dissents.

Judge GREENE dissenting.

Although I agree with the majority that the North Carolina fishing industry is pervasively regulated and thus falls within the *Colonnade-Biswell* doctrine permitting warrantless inspections, I

do not agree that the warrantless inspections allowed under Section 113-136(k) meet the reasonableness requirements set forth in *Burger*. *See New York v. Burger*, 482 U.S. 691, 702-03, 96 L. Ed. 2d 601, 614 (1987). Specifically, in my opinion the statute does not sufficiently restrict the discretion of the inspecting officers.

I agree with the majority's characterization as "substantial" the State's interest in the maintenance, preservation, protection and development of our marine resources. Furthermore, for the reasons articulated by the majority, the ability of enforcement officers to inspect without the requirement of a warrant furthers this substantial interest. Accordingly, I agree that the first two prongs of the *Burger* test are met. *See Burger*, 482 U.S. at 702-03, 96 L. Ed. 2d at 614. However, I disagree with the majority's conclusion that Section 113-136(k), "in terms of the certainty and regularity of its application," serves as "a constitutionally adequate substitute for a warrant." *Id*. In order to comply with this third requirement, a statute authorizing warrantless inspections must (1) "advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope," and (2) "limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703, 96 L. Ed. 2d at 614 (citations omitted).

The notice requirement contemplates a statute which is "sufficiently comprehensive and defined" to put the owner of commercial premises on notice that his property "will be subject to periodic inspections undertaken for specific purposes," *Donovan v. Dewey*, 452 U.S. 594, 600, 69 L. Ed. 2d 262, 270 (1981), and I agree that the portion of Section 113-136(k) at issue meets this requirement. The statute makes it unlawful to refuse to allow the inspection of fish (thus a fish dealer cannot help but know that periodic inspections of his fish will occur) that the officer reasonably believes to be possessed incident to an activity regulated by any law or rule over which inspectors and protectors have enforcement jurisdiction (indicating that the purpose of an inspection is to determine compliance with the regulatory scheme).

In addition to providing notice, however, the statute must also be "carefully limited in time, place, and scope." *United States v. Biswell*, 406 U.S. 311, 315, 32 L. Ed. 2d 87, 92 (1972). With regard to place, Section 113-136 prohibits warrantless searches only "within the curtilage of a dwelling or of the living quarters of a vessel . . . ." N.C.G.S. § 113-136(l) (Supp. 1991). Nothing in the

statutory framework of Section 113-136 otherwise limits the places at which inspections may be performed, or the hours during which inspections may occur. The majority concludes that the failure of Section 113-136 to establish time restrictions is not fatal. However, the footnote in *Burger* upon which the majority bases its conclusion addresses only the adequacy of a statute which fails to limit the *number of searches* that may be conducted of a particular business during any given period, not the hours during which such inspections may occur. The *Burger* Court concluded that the omission of limits on the frequency of inspections is not determinative of the statute's constitutionality "so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers." *Burger*, 482 U.S. at 711 n.21, 96 L. Ed. 2d at 619 n.21 (although it did not limit the number of searches, statute at issue restricted conduct of inspections to "regular and usual business hours" of "vehicle-dismantling and related industries" to "examine records as well as any vehicles or parts of vehicles which are subject to [the statute] and which are on the premises"). And although I am aware, as the majority notes, that courts have upheld statutes authorizing warrantless inspections which contain no restrictions as to the hours during which the inspections may take place, the pivotal factor in the court's rationale in each of these cases is the ongoing and unpredictable hours of operation of the regulated enterprise. *See, e.g., Lovgren v. Byrne*, 787 F.2d 857 (3d Cir. 1986) (warrantless inspection of commercial fishing vessels and surrounding vehicles, buildings, piers, or dock facilities); *Tart v. Massachusetts*, 949 F.2d 490 (1st Cir. 1991) (warrantless documentation check of commercial fishing vessels); *United States v. Dominguez-Prieto*, 923 F.2d 464 (6th Cir. 1991), *cert. denied*, --- U.S. ---, 114 L. Ed. 2d 468 (1991) (warrantless inspection of trucks). Section 113-136(k), however, does not limit the entities subject to warrantless inspections to those with unpredictable hours of operation, such as commercial fishing vessels. Rather, the statute permits the inspection of fish at any time day or night, wherever located — whether on a dock, on a boat, in a fish house, restaurant, building, or grocery store — and as often as the protector, inspector, or "other law enforcement officers" wish to inspect. The inspecting officer need only reasonably believe that the fish are possessed *incident to*, not in violation of, a regulated activity (or with regard to vehicles traveling along the primary highways of the State, that someone in the vehicle "is or has recently been engaged in an activity regulated by the Wildlife Resources Commission"). The sole restriction in

Section 113-136 prohibiting inspections within the curtilage of a dwelling or the living quarters of a vessel "is plainly insufficient to provide either a meaningful limitation on the otherwise unlimited discretion the statute affords or a satisfactory means to minimize the risk of arbitrary and/or abusive enforcement." *People v. Scott*, 593 N.E.2d 1328, 1344 (N.Y. 1992). Consistent with the United States Supreme Court's interpretation of the federal Fourth Amendment, and with our own Constitution's prohibition against unreasonable searches and seizures, *see* N.C. Const. art. I, § 20, I would hold that in order for such warrantless inspections, in particular of fish houses and other businesses with regular hours of operation, to be reasonable, greater restrictions on the inspecting officers' discretion are required. *See, e.g.*, N.C.G.S. § 113-302.1 (1990) (reasonable warrantless inspection of premises by protectors to determine whether wildlife is possessed in accordance with applicable laws or rules limited to an appropriate time of day).

For the foregoing reasons, I conclude that the portion of Section 113-136(k) permitting the warrantless inspection of fish, wherever located and without limitation, is not a constitutionally adequate substitute for a warrant and is therefore in violation of the Fourth Amendment. Accordingly, I would affirm the trial court's order to the extent that it found Section 113-136(k)'s authorization of warrantless inspections of fish to be unconstitutional.