[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 10, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-10557
Non-Argument Calendar

_____

D. C. Docket No. 07-00260-CR-2-JHH-JEO

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTWAN LAMOUNT STEED,

Defendant,

HAROLD ORVEN OSGOOD,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(November 10, 2008)**

Before CARNES, WILSON and FAY, Circuit Judges.

PER CURIAM:

Harold Orven Osgood[1] appeals from his conviction and sentence after a jury found him guilty of 1 count of possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Osgood raises the following four issues on appeal: (1) the district court erred by denying his motion to suppress evidence of the marijuana because the search of his commercial motor vehicle violated the Fourth Amendment; (2) the district court abused its discretion by admitting expert testimony under Fed.R.Evid. 703 and 704(b); (3) the district court erred by instructing the jury on deliberate ignorance; and (4) the district court violated Osgood's Sixth Amendment rights by enhancing his sentence based on a prior conviction that had not been pled or proven to the jury. For the reasons set out below, we affirm.

## I.

### A. Osgood's Motion to Suppress

Before trial, Osgood filed a motion to suppress marijuana discovered in connection with a traffic stop and an administrative inspection of a commercial motor vehicle. He argued, inter alia, that the search of the truck violated the Fourth Amendment because there was no probable cause to make the initial stop and that

---

[1] Osgood's codefendant, Antwan Lamount Steed, is not a party to this appeal.

an Alabama statute authorizing the administrative inspection violated the Fourth Amendment under the Supreme Court's decision in New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). With respect to the latter point, he argued that the statute violated the third prong of the test set out in Burger because it did not provide an adequate substitute for a warrant, as it did not provide notice of when, where, and under what circumstances an inspection may be conducted and, thus, did not sufficiently constrain the discretion of inspecting officers.

The government responded that the initial stop was justified because the officer had probable cause to believe a traffic violation had occurred. The government also argued, inter alia, that the evidence should not be suppressed even if Alabama's administrative inspection statute was unconstitutional because, under Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the inspecting officer reasonably relied on the validity of the statute.

At the suppression hearing, the government called Alejandro Gonzalez, a law enforcement officer with the Interstate Criminal Enforcement Unit of the Hoover City Police Department, who testified as follows. On May 21, 2007, while monitoring traffic from the median of Interstate 20, he observed a tractor-trailer following another vehicle too closely. Without putting his overhead lights on, Gonzalez exited the median and pulled up alongside the truck, at which point the

3

truck attempted to move into Gonzalez's lane without using a turn signal. This constituted an improper lane change because the truck did not use its turn signal and it was not safe to make the lane change. At that point, Gonzalez pulled the truck over.

Upon making contact with Osgood, who was the driver of the truck, Gonzalez immediately informed Osgood, even before asking for Osgood's license, that he was conducting a level two inspection of the truck and would not be issuing a traffic citation. A level two inspection was a safety inspection requiring Gonzalez to review the truck's paperwork and equipment. Gonzalez conducted this inspection pursuant to an Alabama statute, and the government asked the court to take judicial notice of Ala. Code § 32-9A-3.

When Osgood asked why he had been pulled over, Gonzalez informed him that he had been following another vehicle too closely. Osgood and Steed, his passenger, exhibited signs of nervousness, and Osgood produced paperwork for the truck that contained several omissions and irregularities. While Gonzalez was in the midst of his inspection, he requested a canine unit, which arrived shortly thereafter and gave a positive alert to the trailer. After Gonzalez finished his inspection, he informed Osgood that, based on the canine's alert, he was going to conduct a probable cause search of the trailer. The search revealed approximately

4

1,600 pounds of marijuana. On cross-examination, Gonzalez testified that it was in the officer's discretion regarding which vehicles to inspect and that he had not been provided with any procedures or regulations on when to conduct an inspection.

The district court denied Osgood's motion to suppress. It first found that the initial stop was valid because Gonzalez had probable cause to believe that the driver of the truck was following another vehicle too closely and had made an improper lane change, both of which constituted traffic violations under Alabama law. The court then concluded that the Alabama statute and federal regulations authorizing administrative inspections of commercial motor vehicles satisfied the three-part test in Burger. Because the initial stop and administrative inspection were both valid, the court found that the subsequent probable cause search of the trailer, based on the canine's positive alert, was constitutional. The court alternatively concluded that, even if the Alabama statute was unconstitutional, suppressing the evidence would still be inappropriate because, under Krull, Gonzalez relied in good faith on the validity of the statute.

## B. Trial

At trial, the government called Gonzalez, who testified extensively regarding his background as a law enforcement officer and an inspector of commercial motor

vehicles. Gonzalez testified that criminal interdiction included "looking beyond a traffic stop" for signs of nervousness, such as hands shaking and other body language. Defense counsel objected to this testimony under, inter alia, Fed.R.Evid. 703 and 704, but the district court overruled the objection, finding that Gonzalez was merely relating his experience.

Shortly thereafter, and in response to an open-ended question regarding drug trafficking on the roadways, Gonzalez premised his response by citing his training and experiences – specifically referring to his police work in Los Angeles and Hoover City, discussions that he had with other law enforcement officers over the course of his career, and literature with respect to trends in drug trafficking published by the El Paso Intelligence Center ("EPIC) and the National Drug Intelligence Center ("NDIC"). Each time Gonzalez referred to his training and experience, defense counsel objected to the testimony as hearsay, and the court overruled his objections.

With respect to the incident on May 21, 2007, involving Osgood and Steed, Gonzalez repeated much of his testimony from the suppression hearing, but also included the following facts. During his interaction with Osgood at the traffic stop, Gonzalez noticed that Osgood's hands were visibly shaking, that he had sweat beads on his forehead even though the air conditioner had been on, and that

6

Osgood did not make direct eye contact with Gonzalez when they were speaking. Gonzalez also noticed that Steed looked uneasy and had elevated breathing, which was unusual because he had just awaken. Gonzalez also observed five cellular telephones in the truck. The seal numbers listed on three shipping papers provided by Osgood did not match the number on the actual seal on the trailer. Gonzalez also observed that the shipping papers did not have any phone numbers or addresses. Although the shipping papers indicated that the truck was traveling from southern California to Orlando, its location on Interstate 20 was "off route" by about 150 miles. Osgood provided Gonzalez with a carbon receipt from a truck repair shop in southern California dated May 18, 2007, and written on the receipt in pen was a seal number matching the seal number on the trailer. Osgood used a key that he had in order to unlock the trailer for the authorities. Gonzalez testified that, according to Osgood's logbook, the entry for May 18 did not indicate any repairs or any loading times, even though the receipt from the repair shop occurred that day and the shipping papers indicated that three cargo shipments were loaded on that day. There were several inconsistencies between Osgood's logbook and receipts found in the truck as to the truck's location on May 19 and 20. The times provided in Osgood's logbook were also "completely off" with those provided in Steed's logbook.

During the jury charge conference, the court read this Circuit's pattern jury instruction on deliberate ignorance.[2] Defense counsel objected to this instruction on two grounds. First, he argued that the government had proceeded under a theory of actual knowledge and, while there was circumstantial evidence suggesting that Osgood had actual knowledge of the drugs in the truck, the instruction was inappropriate because there was no evidence that Osgood deliberately avoided such knowledge. Second, he argued that the pattern instruction was unconstitutional because this Court did not have the power to equate the statutory standard of "willfully and knowingly" to a lower standard

[2] The district court read the following instruction:

When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if the Defendant is aware of a high probability of its existence, unless the Defendant actually believes that it does not exist.

So, with respect to the issue of the Defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the Defendant believed that he possessed marijuana, a controlled substance, and deliberately and consciously tried to avoid learning that there was marijuana in the packages so possessed in order to be able to say, if apprehended, that he did not know the contents of the packages, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

In other words, you may find that a Defendant acted "knowingly" if you find beyond a reasonable doubt either: that the Defendant actually knew that he possessed marijuana; or that he deliberately closed his eyes to what he had every reason to believe was the fact.

I must emphasize, however, that the requisite proof of knowledge on the part of the Defendant cannot be established by merely demonstrating that the Defendant was negligent, careless, or foolish.

8

requiring only a "high probability of knowledge."

Defense counsel rested without putting on any evidence, and he informed the court that Osgood was choosing not to testify, "especially since he has got a prior conviction that hasn't been introduced in the trial of this case." After the parties presented closing arguments and the court instructed the jury – including on the deliberate ignorance instruction quoted in the margin above – the jury returned a guilty verdict against Osgood on the lone charge in the indictment.

## C.    Sentencing

The probation officer prepared a pre-sentence investigation report ("PSI") and calculated Osgood's applicable guideline range. Osgood's base offense level was 26 pursuant to U.S.S.G. § 2D1.1(a)(3) and (c)(7) because the offense involved at least 100 kilograms but less than 400 kilograms of marijuana. Osgood received a criminal history category of IV. With respect to his criminal history, the probation officer reported that, in 2003, Osgood pled guilty in state court to possession with intent to distribute cocaine and possession of cocaine, for which he was sentenced to 10 years' imprisonment. An offense level of 26 and a criminal history category of IV gave Osgood an applicable guideline range of 92 to 115 months' imprisonment. However, the probation officer determined that Osgood was subject to the statutory mandatory minimum sentence of 120 months'

imprisonment under 21 U.S.C. § 841(b)(1)(B), which also became his guideline sentence.[3]

At sentencing, Osgood objected, <u>inter alia</u>, on the ground that his prior conviction had not been pled or proven to the jury and, therefore, could not be used to enhance his sentence. The court confirmed that Osgood had preserved that issue for appeal and, after overruling his other objections, adopted the factual findings and guideline calculations in the PSI and imposed the statutory minimum sentence of 120 months' imprisonment.

## II.

### A.     Motion to Suppress

> We review the district court's denial of a motion to suppress evidence as a mixed question of law and fact. The district court's findings of fact are viewed under the clearly erroneous standard; its application of the law to those facts is subject to <u>de novo</u> review. We also construe all facts in the light most favorable to the prevailing party in the district court – here, the government.

<u>United States v. Boyce</u>, 351 F.3d 1102, 1105 (11th Cir. 2003) (quotations and citation omitted).

"While the Supreme Court has repeatedly stressed that reasonableness is the ultimate touchstone for addressing the constitutionality of a search under the

---

[3] During the early stages of the litigation, the government filed a notice under 21 U.S.C. § 851 informing Osgood that he would receive an enhanced penalty because he had been previously convicted of a felony drug offense.

Fourth Amendment, the High Court has also recognized that a warrant is usually required where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing." United States v. Gonzalez, 71 F.3d 819, 824-25 (11th Cir. 1996) (citations, quotations, and alteration omitted). "Thus, the general rule in the criminal context is that warrantless searches are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Id. at 825 (quotations omitted).

"[A]n administrative inspection of a closely regulated business is a well-established exception to the warrant requirement for a search." Crosby v. Paulk, 187 F.3d 1339, 1346 (11th Cir. 1999) (quotation omitted). The Supreme Court in Burger explained that "[b]ecause the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy . . . and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." 482 U.S. at 702, 107 S.Ct. at 2643-44.

The Court in Burger laid out a three-part test for determining whether a warrantless administrative inspection in a pervasively regulated industry comports with the Fourth Amendment:

First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made. . . .

Second, the warrantless inspections must be necessary to further the regulatory scheme. . . .

Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.

Id. at 702-03, 107 S.Ct. at 2644 (quotations, citations, and alterations omitted).

Osgood generally argues[4] that the Alabama statute authorizing Gonzalez to conduct the administrative inspection of the truck does not satisfy the third prong of the Burger test.[5] With respect to the third prong, the Court in Burger explained:

[T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To

[4] To the extent that Osgood challenges the validity of the initial stop, we conclude that it was justified because Gonzalez had probable cause to believe that the driver had committed a traffic violation. Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). Gonzalez testified that the truck was following another vehicle too closely and made an illegal lane change, both of which constitute a violation of the Alabama traffic code. Ala. Code § 32-5A-88, 89. Although Osgood disputes the former violation, it is unnecessary to address his argument in that regard because he does not dispute the latter violation. United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (arguments not raised on appeal are abandoned). Thus, Gonzalez was justified in stopping the truck because he had probable cause to believe that at least one traffic violation had occurred.

[5] The parties agree that Burger applies, and every circuit to address the issue has agreed that commercial trucking is a pervasively regulated industry within the meaning of Burger. United States v. Mendoza-Gonzalez, 363 F.3d 788, 794 (8th Cir. 2004); United States v. Maldonado, 356 F.3d 130, 135 (1st Cir. 2004); United States v. Vasquez-Castillo, 258 F.3d 1207, 1210 (10th Cir. 2001); United States v. Fort, 248 F.3d 475, 480 (5th Cir. 2001); United States v. Dominguez-Prieto, 923 F.2d 464, 468 (6th Cir. 1991).

12

perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.  In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

Id. at 703, 107 S.Ct. at 2644 (quotations and citations omitted).

The Supreme Court in Burger addressed a New York statute authorizing administrative inspections of automobile junkyards, which provided in relevant part:

> Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

Id. at 694 n.1, 107 S.Ct. at 2639 n.1.  Applying the standard described above, the Court concluded that this statute provided a constitutionally adequate substitute for a warrant, offering the following analysis:

> Third, [the New York statute] provides a constitutionally adequate substitute for a warrant. The statute informs the operator of a vehicle dismantling business that inspections will be made on a regular basis. Thus, the vehicle dismantler knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute. [The statute] also sets forth the scope of the inspection and, accordingly, places the operator on notice as to how to comply with the statute. In addition, it notifies the operator as to who is authorized to conduct an inspection.

> Finally, the time, place, and scope of the inspection is limited to place appropriate restraints upon the discretion of the inspecting officers. The officers are allowed to conduct an inspection only during the regular and usual business hours. The inspections can be made only of vehicle-dismantling and related industries. And the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

Id. at 711-12, 107 S.Ct. at 2648 (quotations, citations, alterations, and footnote omitted).

In this case, we ultimately decline to address whether the Alabama statute provides a constitutionally adequate substitute for a warrant under Burger. Instead, we conclude that, even if the statute fails Burger's third prong, Gonzalez's good-faith reliance on the statute's validity was objectively reasonable under the Supreme Court's decision in Krull. See United States v. Cardenas-Alatorre, 485 F.3d 1111, 1115 & n.9 (10th Cir.) (electing to rely on Krull's good-faith exception – and assuming without deciding that the statute at issue was unconstitutional – because such an approach was consistent with the canon of constitutional avoidance), cert. denied, 128 S.Ct. 417 (2007).

In Krull, the Supreme Court addressed "whether a good-faith exception to the Fourth Amendment exclusionary rule applies when an officer's reliance on the constitutionality of a statute is objectively reasonable, but the statute is

14

subsequently declared unconstitutional." 480 U.S. at 346, 107 S.Ct. at 1165. The Court answered the issue in the affirmative, holding that "[u]nless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law." Id. at 349-50, 107 S.Ct. at 1167.

Specifically, the Court held that an officer's reliance on an Illinois statute authorizing administrative searches of a heavily regulated industry was objectively reasonable, even though it was subsequently declared unconstitutional by the Illinois Supreme Court. Id. at 356-60, 107 S.Ct. at 1171-72. The officer's reliance was objectively reasonable because, on several previous occasions, the U.S. Supreme Court had "upheld legislative schemes that authorized warrantless administrative searches of heavily regulated industries." Id. at 357, 107 S.Ct. at 1171. Furthermore, the reasons underlying the Illinois Supreme Court's decision invalidating the statute were "not so obvious that an objectively reasonable police would have realized the statute was unconstitutional . . . ." Id. at 360, 107 S.Ct. at 1172.

In this case, as explained below, an analysis of the Alabama statute leads us to conclude that the statute was not "clearly unconstitutional" under Burger's third prong, thus rendering Gonzalez's reliance on the statute objectively reasonable for purposes of Krull's good-faith exception. See United States v. Stowe, 100 F.3d

15

494, 498 (7th Cir. 1996) ("But our cursory review of the statute is only to determine whether it was so 'clearly unconstitutional' that the police could not in good faith have relied on it.").[6]

The Alabama statute at issue in this case provides in full:

Any records required to be maintained by operators of commercial motor vehicles pursuant to state or federal laws or regulations shall be open to inspection during the normal business hours of a carrier by members designated by the director. The inspection may be made without a warrant. Members of the department designated by the director may also go on the property of an operator of a commercial motor vehicle to conduct inspections of facilities and records to ensure compliance with applicable state and federal laws and regulations governing commercial motor vehicle operations.

The director may promulgate reasonable rules and regulations relating to this chapter subject to the Alabama Administrative Procedure Act.

Ala. Code § 32-9A-3; see id. § 32-9A-1(3)-(4) (defining "department" as the Alabama Department of Public Safety and "director" as the Director of the Alabama Department of Public Safety). Pursuant to Title 32 of the Alabama Code, the Alabama Department of Public Safety has also adopted the Federal Motor Carrier Safety ("FMCS") Regulations. Ala. Admin. Code § 760-x-1-.16 (adopting,

_____

[6] Osgood argues that the decision in Krull itself put the Alabama legislature and Gonzalez on notice that the Alabama statute in this case was unconstitutional. That argument is incorrect because the Supreme Court in Krull expressly declined to address the constitutionality of the Illinois administrative inspection statute, noting that it had granted a writ of certiorari in Burger and would address the constitutionality of a similar statute in that case. Krull, 480 U.S. at 357 n.13, 107 S.Ct. at 1171 n.13. Thus, the Supreme Court in Krull accepted the Illinois Supreme Court's ruling as true for purposes of the appeal.

16

inter alia, 49 C.F.R. §§ 390-399, and authorizing the Alabama Department of

Public Safety to enforce those federal regulations); see also Ala. Code

§ 32-9A-2(a) (requiring compliance with the FMCS Regulations).

Osgood argues that he did not have reasonable notice that he would be

subject to the type of inspection that Gonzalez conducted. However, the language

in § 32-9A-3 specifically provides that designated officials may inspect

commercial motor vehicle records in order to ensure compliance with state and

federal law. Ala. Code § 32-9A-3.

Moreover, the FMCS Regulations adopted in Alabama require, inter alia,

that "[e]very driver and employee shall be instructed regarding, and shall comply

with, all applicable regulations contained in this subchapter." 49 C.F.R.

§ 390.3(e)(2); see United States v. Maldonado, 356 F.3d 130, 136 (1st Cir. 2004)

(concluding that, under Burger's third prong, the FMCS Regulations, including

§ 390.3(e)(2), gave "ample notice to interstate trucks that inspections will be made

on a regulator basis"). One such regulation authorizes federal agents :

> to enter upon, to inspect, and to examine any and all lands, buildings,
> and equipment of motor carriers and other persons subject to the
> Interstate Commerce Act, the Department of Transportation Act, and
> other related Acts, and to inspect and copy any and all accounts,
> books, records, memoranda, correspondence, and other documents of
> such carriers and other persons.

49 C.F.R. Ch. III, Subch. B, App. B(1); see also 49 C.F.R. § 396.9(a) (authorizing

17

federal agents to inspect motor vehicles in operation).[7]

Furthermore, in our only decision analyzing a statute under Burger,[8] we briefly evaluated and upheld the validity of a Georgia statute authorizing administrative inspections of commercial properties where alcohol was sold. Crosby, 187 F.3d at 1346-49. With respect to Burger's third prong, we concluded that "the Georgia statute giving the Commissioner of Revenue the authority to make such inspections gives notice to owners of commercial properties where alcohol is sold of the time, place, and scope of inspections . . . ." Id. at 1347. The Georgia statute in that case provided in pertinent part:

> The commissioner and his agents may enter upon the licensed premises of any person engaged in the manufacture, transportation, distribution, sale, storage, or possession of alcoholic beverages at any

[7] Osgood refers to the cautionary note in Appendix B for the proposition that these federal regulations have no application to the states. The cautionary note, however, only forbids states from adopting these federal regulations as a condition to receiving grants in connection with the Motor Carrier Safety Assistance Program, which has no application to this case. See 49 C.F.R. Ch. III, Subch. B, App. B, cautionary note, cross-referencing 49 C.F.R. § 350.

[8] Our more recent decision in Bruce v. Beary, 498 F.3d 1232 (11th Cir. 2007) is not on point in this regard. In that case, we held, inter alia, that, under the facts alleged, an administrative inspection of an automobile body repair and salvage shop was unreasonable because it resembled a criminal raid and substantially exceeded the scope of a lawful administrative search. 498 F.3d at 1244-48; see also Swint v. City of Wadley, Ala., 51 F.3d 988, 998-99 (11th Cir. 1995) (concluding that no reasonable officer could have believed that two nightclub raids were lawful administrative searches because there was "a massive show of force"). Significantly, in reaching this conclusion, we assumed that the Florida statute authorizing the inspection was constitutional under Burger because the plaintiff failed to challenge a Florida Supreme Court ruling to that effect. Id. at 1239. In this case, however, because Osgood essentially brings a facial challenge to the constitutionality of the Alabama statute under Burger – but does not argue that Gonzalez's inspection was unreasonable or exceeded the scope of a lawful administrative search – Bruce is not on point.

time for the purpose of inspecting the premises and enforcing this title and shall have access during the inspection to all books, records, and supplies relating to the manufacture, transportation, distribution, sale, storage, or possession of alcoholic beverages.

Id. (emphasis omitted). This Georgia statute does not provide any more notice of potential inspections than the Alabama statute or federal regulations in this case. See also Burger, 482 U.S. at 711, 107 S.Ct. at 2648 (concluding that the New York statute provided sufficient notice that inspections would occur on a regular basis, even though the statute did not so expressly provide); State v. Nobles, 422 S.E.2d 78, 83 (N.C. Ct. App. 1992) ("Participation in a closely regulated business in and of itself places a fish dealer on notice that inspections are certain to occur. The cases recognize this type of constructive notice in these pervasively regulated industries."). Thus, both § 32-9A-3 and the FMCS Regulations sufficiently put Osgood on notice that, as a driver of a commercial motor vehicle, his records and vehicle were subject to the type of inspection conducted in this case.

The Alabama statute also provides notice as to which officers may conduct the inspections. Burger, 482 U.S. at 711, 107 S.Ct. at 2648. Specifically, it authorizes "[m]embers of the department [of public safety] designated by the director [of public safety]" to conduct inspections. Ala. Code § 32-9A-3. The FMCS Regulations also specifically designate special agents of the Federal Motor Carrier Safety Administration as the officers authorized to conduct inspections. 49

19

C.F.R. § 396.9(a); 49 C.F.R. Ch. III, Subch. B, App. B(3). The Supreme Court in

Burger concluded that the New York statute, authorizing "any police officer" to

conduct the inspection, sufficiently provided notice to junkyard operators

regarding who was authorized to conduct the inspection. 482 U.S. at 694 n.1, 711,

107 S.Ct. at 2639 n.1, 2648. Thus, the Alabama statute and the federal regulations

are favorable in this respect because, unlike the New York statute upheld in

Burger, they more specifically designate which officials may conduct inspections.

United States v. Dominguez-Prieto, 923 F.2d 464, 469 (6th Cir. 1991) ("When this

statutory inspection program is analyzed under the Burger test or compared to the

inspection statute held to be constitutional in Burger, it becomes apparent that the

third element of the test is met. In Burger, the statutory scheme permitted an

inspection by 'any police officer.' The inspection scheme in the instant case limits

the authority to conduct an inspection to Public Service Commission officers.");

see also V-1 Oil Co. v. Means, 94 F.3d 1420, 1427 (10th Cir. 1996) ("Only special

agents of the Federal Highway Administration, Wyoming patrol officer, and other

employees and agents of the Wyoming Department of Transportation are

authorized to conduct the safety inspections."); Com. v. Petroll, 696 A.2d 817, 829

(Pa. Super. Ct. 1997) ("The statute at issue specifies who may conduct the

inspection, a police officer or qualified Commonwealth employee as defined by

20

that statute.").

With respect to the scope of inspections under § 32-9A-3, the statute is specifically limited to the "commercial motor vehicle" industry.  Ala. Code § 32-9A-3; id. § 32-9A-1(2) (defining "commercial motor vehicle" to include any self-propelled or towed vehicle used on the highways in commerce if it has a gross weight of more then 10,000 pounds, is designed to transport more than 15 passengers, or is used to transport hazardous materials).  The Supreme Court in Burger concluded that the scope of the New York statute was limited because "inspections can be made only of vehicle-dismantling and related industries." Burger, 482 U.S. at 711, 107 S.Ct. at 2648; see United States v. Castelo, 415 F.3d 407, 411 (5th Cir. 2005) (upholding a Mississippi statute authorizing administrative inspections in part because it applied only to commercial vehicles); V-1 Oil Co., 94 F.3d at 1427 ("Here, by contrast, the inspections are conducted pursuant to narrow statutes and regulations directed at a particular industry."); Dominguez-Prieto, 923 F.2d at 469-70 (concluding that a Tennessee administrative inspection statute was limited in scope because it applied only to "motor carriers").

Other circuits have gone even further with respect to the FCMS Regulations and have stated that they have a "carefully delineated scope" that "suitably cabins the discretion of the enforcing officer." Maldonado, 356 F.3d at 136; accord V-1

21

Oil Co., 94 F.3d at 1427 ("The [federal] regulations make it clear the inspections are limited in scope to safety concerns. They do not authorize a general search by any law enforcement officer.") (citation omitted). In this respect, Osgood's suggestion that inspections are unlimited in scope is undermined by the fact that Gonzalez did not search the inside of the trailer as part of his safety inspection, but rather waited until he obtained probable cause from the canine unit. See State v. McGillicuddy, 646 A.2d 354, 355 (Me. 1994) (upholding the validity of a statute authorizing an administrative inspection of a potato packing house under Burger's third prong in part because "[t]here is nothing in the record that remotely suggests any abuse of discretion on the inspector's part").

With respect to limits as to time, the Alabama statute authorizes inspections "during normal business hours." Ala. Code § 32-9A-3. This time limitation is nearly identical to the limitation in the New York statute upheld in Burger, authorizing inspections "during regular and usual business hours." 482 U.S. at 694 n.1, 711, 107 S.Ct. at 2639 n.1, 2648; see also Horner v. State, 836 P.2d 679, 682 (Okla. Crim. App. 1992) (upholding an Oklahoma statute authorizing administrative inspections of junkyards in part because the "time of the inspection [wa]s limited to 'reasonable hours on business days'").

Nonetheless, Osgood argues that this time limitation does not amount to a

22

meaningful restraint in the trucking industry because normal business hours equate to any time that trucks are on the road. However, numerous courts have rejected the idea of imposing time limitations in the trucking context:

> The statutory scheme at issue here does not limit the time frame within which such inspections are permitted. Such a limitation would, of course, render the entire inspection scheme unworkable and meaningless. Trucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time.

Dominguez-Prieto, 923 F.2d at 470; accord United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001) (same); Maldonado, 356 F.3d at 136 ("We conclude, therefore, that effective enforcement of the regulatory regime [governing commercial vehicles] would be impossible in the absence of impromptu inspections."); V-1 Oil Co., 94 F.3d at 1427 ("A restriction on the time of inspection would also be impracticable because trucks operate around the clock."); State v. Rechtenbach, 650 N.W.2d 290, 293 (S.D. 2002) ("To effectively regulate the trucking industry, state troopers need to make random stops."); State v. Crum, 19 P.3d 172, 177 (Kan. 2001) ("Since commercial trucking occurs on a 24-hour basis, [the Kansas statute] is entirely reasonable in not limiting when a commercial vehicle could be stopped."). Furthermore, it is noteworthy that, in Crosby, we upheld the validity of a Georgia statute under Burger that authorized administrative inspections "at any time." 187 F.3d at 1347.

23

With respect to place, Osgood suggests that the Alabama statute is deficient because it does not designate specific locations where inspections will take place. It is true that § 32-9A-3 and the FCMS Regulations do not designate specific inspection locations, and some courts have upheld state administrative inspection statutes in part because they did limit inspections to designated locations. See Castelo, 415 F.3d at 411 (upholding a Mississippi statute in part because it limited inspections of motor vehicles to the state's highways); Vasquez-Castillo, 258 F.3d at 1211 (upholding a New Mexico statute requiring commercial motor vehicles to stop at every port of entry); Crum, 19 P.3d at 177-78 (concluding that limiting inspections to the highways of the state was sufficient under Burger).

Even though the Alabama statute lacks limitations with respect to place, this absence, by itself, does not necessarily invalidate the statute under Burger. First, as discussed above, it appears that the Alabama statute, as a whole, and coupled with the adopted federal regulations, sufficiently limits the discretion of inspecting officers in several other respects. See Burger, 482 U.S. at 711 n.21, 107 S.Ct. at 2648 n.21 (noting that the New York statute's failure to limit the number of searches was "not determinative of the result so long as the statute, as a whole, places adequate limits upon the discretion of inspecting officers"); Crum, 19 P.3d at 177 ("While the lack of a stated limitation may be a factor in the analysis of a

particular statute, this will not be determinative as long as adequate limits on the discretion of the inspection officers exist."); Nobles, 422 S.E.2d at 85 ("A careful reading of Burger discloses that the time, place, and scope limitations are only factors to consider in evaluating the constitutionality of the statute; they are not dispositive.").

Furthermore, other courts have noted that "[t]rucks can easily avoid fixed checkpoints and, by use of citizens' band radios, can avoid temporary checkpoints." V-1 Oil Co., 94 F.3d at 1426; see Rechtenbach, 650 N.W.2d at 293 ("Ports of entry, inspection stations and roadblocks have only limited effectiveness. Citizen's band (CB) radios, cell phones and other modern technology allow truckers to communicate enforcement locations and to either remedy violations or avoid inspection sites."); McCauley v. Com., 435 S.Ed.2d 891, 894 (Va. Ct. App. 1993) (noting that "many weigh stations can be easily avoided and truckers can communicate with each other and avoid any other fixed-point inspection stations").

In addition, other circuits have upheld administrative inspection statutes and regulations in the commercial trucking context without discussing whether the statute at issue imposed limits on the location of the inspections. Maldonado, 356 F.3d at 136; United States v. Fort, 248 F.3d 475, 482 (5th Cir. 2001); Dominguez-

Prieto, 923 F.2d at 469-70.

Aside from the absence of any limitation as to place, Osgood also points out that the statute does not limit an officer's discretion regarding which vehicles to inspect. In this respect, Gonzalez testified that it was in the officer's discretion when to perform an inspection and that he had not been provided with any rules or regulations regarding when to conduct an inspection. Although no federal appellate court has done so, several state courts have struck down inspection statutes under Burger's third prong on these grounds. See, e.g., State v. McClure, 74 S.W.3d 362, 373-76 (Tenn. Crim. App. 2001) (holding that a vehicle inspection under a Tennessee statute and the FCMS Regulations did not satisfy Burger's third prong because, despite being limited in time, place, and scope, there was testimony that the inspecting officers had "complete discretion to decide which vehicles to inspect" and were "not given any guidance by the rules or superior officers"); State v. Landrum, 739 N.Ed.2d 1159, 1165 (Ohio Ct. App. 2000) (holding that a commercial motor vehicle inspection did not satisfy Burger's third prong where inspecting officers had complete discretion over which trucks to stop and when they could be stopped); State v. Hone, 866 P.2d 881, 883 (Ariz. Ct. App. 1993) (concluding that an Arizona statute authorizing officers to stop livestock trailers did not satisfy Burger's third prong because it gave the officers discretion to stop

26

any vehicle); Com. v. Bizarria, 578 N.E.2d 424, 429 (Mass. Ct. App. 1991) (concluding that a statute authorizing administrative inspections of an auto body shop did not satisfy Burger in part because there were not "standard procedures governing administrative searches").

Nonetheless, these state court decisions are difficult to reconcile with the fact that the Supreme Court in Burger noted that "[i]t was unclear from the record why, on that particular day, Burger's junkyard was selected for inspection." 482 U.S. at 694 n.2, 107 S.Ct. at 2639 n.2. The Court nonetheless upheld the New York statute without expressing concern over this fact. See id. at 711-12, 107 S.Ct. at 2648; United States v. Branson, 21 F.3d 113, 117 (6th Cir. 1994) ("The fact that the officers used no articulated method in deciding to inspect Branson's business does not distinguish this case from Burger. . . . Here, as in Burger, the reason for the inspection is not material.").[9]

The above analysis of the applicable case law leads us to conclude that the Alabama statute was not "clearly unconstitutional" under Burger's third prong for purposes of applying the good-faith exception in Krull. This conclusion is further supported by the fact we evaluate the objective reasonableness of Gonzalez's reliance on the statute under a "reasonably well-trained officer" standard as

---

[9] Osgood has abandoned any contention on appeal that Gonzalez's administrative inspection was a pretext for a drug search. Cunningham, 161 F.3d at 1344.

opposed to a "reasonable jurist" standard. United States v. Taxacher, 902 F.2d

867, 871-73 (11th Cir. 1990) (adopting and applying this standard in the context of

an officer's reliance on a defective warrant). Thus, based on the above analysis,

we hold only that it was objectively reasonable for Gonzalez, a well-trained officer,

to rely on the validity of the Alabama administrative inspection statute. Krull, 480

U.S. at 349, 356-60, 107 S.Ct. at 1167, 1171-72.

Our above conclusion requires that we affirm the district court's denial of

Osgood's motion to suppress. Because Gonzalez was authorized to detain Osgood

for purposes of conducting the administrative inspection, his request for the canine

unit during this time period was also lawful.[10] And because the canine gave a

positive alert to the trailer, Gonzalez had probable cause to search the trailer

pursuant to the automobile exception to the warrant requirement. United States v.

Tamari, 454 F.3d 1259, 1264-65 (11th Cir. 2006) ("[T]he automobile exception

permits warrantless vehicle searches if the vehicle is operational and agents have

probable cause to believe the vehicle contains evidence of a crime. . . . We have

long recognized that probable cause arises when a drug-trained canine alerts to

---

[10]    As long as Gonzalez was authorized to conduct the administrative inspection, no level of suspicion was required for him to request the canine unit during the course of that inspection. See Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (holding that a canine sniff during a lawful traffic stop is not a search under the Fourth Amendment and, therefore, does not require a reasonable, articulable suspicion of criminal activity).

drugs.") (quotation omitted). Accordingly, we affirm the denial of Osgood's motion to suppress.

## B. **Officer Gonzalez's Expert Testimony**

"[W]e review evidentiary rulings, including whether to admit expert testimony, for abuse of discretion." United States v. Garcia, 447 F.3d 1327, 1344 (11th Cir. 2006).

### Rule 703

Osgood argues that Gonzalez's expert testimony[11] violated Fed.R.Evid. 703 because it acted as a conduit for inadmissible hearsay. As an initial matter, Osgood's argument is difficult to understand because he does not identify any specific hearsay statements that Gonzalez introduced. However, based on Osgood's brief and his objections during Gonzalez's testimony, it appears that the hearsay Osgood is referring to is Gonzalez's general references to conversations that he had with other law enforcement officers over the course of his career, his history of participation in unrelated searches and arrests of criminal suspects, and literature published by EPIC and NDIC keeping him apprised of trends in drug trafficking.

Rule 703 provides in pertinent part:

---

[11] Osgood does not dispute that Gonzalez was qualified to testify as an expert witness under Fed.R.Evid. 702.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed.R.Evid. 703. Thus, subject to the limitations in Rule 703, an expert witness like Gonzalez was permitted to base his testimony on inadmissible hearsay.

With regard to these limitations, we have stated that: "Rule 703, however, is not an open door to all inadmissible evidence disguised as expert opinion." United States v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987). Indeed, under the Rule, "a law enforcement officer testifying as an expert witness may rely on information he received from other people if such sources of information were regularly relied upon by experts in his field." Garcia, 447 F.3d at 1336 (quotations omitted).

In this case, Osgood does not dispute that general training and experience, discussions with other law enforcement officers, participation in searches and arrests of criminal suspects, and literature about trends in law enforcement are reasonably relied upon by experts in the law enforcement field. In any event, we have previously determined similar sources to be reasonably reliable for purposes of Rule 703. See, e.g., id. at 1336 ("[T]here is no abuse of discretion in concluding that the debriefing of suspected drug traffickers is the type of evidence that is reasonably relied upon by seasoned drug enforcement officers in forming opinions

30

or inferences about the use of coded language by drug traffickers.") (quotations omitted); United States v. Brown, 299 F.3d 1252, 1257 (11th Cir. 2002) ("We have no trouble concluding that Rule 703 encompasses hearsay statements in a context such as the instant one, where the government expert specifically testified that his opinion was based on his experience and expertise, in conjunction with the information he received from a DEA intelligence agent and Bermudan authorities, and that such sources of information were regularly relied upon in valuating narcotics."); vacated, 538 U.S. 1010, 123 S.Ct. 1928, 155 L.Ed.2d 847 (2003), remanded to and reinstated by, 342 F.3d 1245 (11th Cir. 2003).[12] In sum, even assuming that the bases of Gonzalez's expertise as a law enforcement agent constituted inadmissible hearsay, his testimony in this regard did not violate Rule 703 because those sources are reasonably relied upon by experts in the field.

Finally, Osgood's reliance on the Second Circuit's decision in United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003) is misplaced for the same reason that the

---

[12] Furthermore, the literature referred to in Gonzalez's testimony was produced by EPIC and NDIC, both of which are part of the Department of Justice. See El Paso Intelligence Center, http://www.usdoj.gov/dea/programs/epic.htm; National Drug Intelligence Center, http://www.usdoj.gov/ndic/about.htm#Top. Thus, this government literature apprising Gonzalez of trends in drug trafficking was sufficiently reliable for purposes of Rule 703. See Soden v. Freightlines Corp., 714 F.2d 498, 502 n.4 (5th Cir. 1983) (noting that Rule 703 has been used to allow expert opinions based on reports prepared by government agencies); Nanda v. Ford Motor Co., 509 F.2d 213, 222 (7th Cir. 1974) ("Facts or data found in the literature of the profession, even though not themselves admissible in evidence, properly form a part of the basis for an expert's opinion.").

defendant's reliance on it was misplaced in <u>Garcia</u>. We explained in <u>Garcia</u> that the Second Circuit in <u>Dukagjini</u> had "concluded that the expert testimony at times departed from the bounds of Rules 702 and 703 and from reliable methodology and the witness had repeatedly deviated from his expertise on drug jargon." <u>Garcia</u>, 447 F.3d at 1336 (quotations omitted). That was so because "the expert in <u>Dukagjini</u> was relying on his conversations with non-testifying witnesses and co-defendants in order to prove the truth of the matter asserted rather than translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement." <u>Id.</u> (quotations omitted). Because the expert testimony in <u>Garcia</u> was based only on the expert's "professional knowledge and ability," we concluded that <u>Dukagjini</u> was not on point. <u>Id.</u> at 1337. In this case, as in <u>Garcia</u>, Gonzalez's expert testimony regarding drug trafficking, criminal indicators, and the commercial trucking industry was all based on his personal training and experience, not on conversations with non-testifying individuals.[13]

---

[13] To the extent that Osgood seeks to raise an argument under the Confrontation Clause by his citation to <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we review it for plain error because Osgood failed to raise it in the district court. <u>United States v. Chau</u>, 426 F.3d 1318, 1321-22 (11th Cir. 2005). Osgood could not show that any error was "plain" under <u>Crawford</u> because there is no binding precedent from the Supreme Court or this Court regarding what otherwise inadmissible sources an expert may rely upon when forming an opinion; <u>see</u> <u>United States v. Lejarde-Rada</u>, 319 F.3d 1288, 1291 (11th Cir. 2003) ("It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.").

**Rule 704(b)**

Osgood contends that the district court erred under Fed.R.Evid. 704(b) by admitting Gonzalez's testimony with respect to Osgood's behavior during the traffic stop because it went to Osgood's potential knowledge that there were drugs in the truck, which is an element of the offense. Rule 704(b) provides in full:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed.R.Evid. 704(b). We have held that there was no violation of Rule 704(b) under the following circumstances:

> In the instant case, the DEA agent testified that it would be unlikely crew members aboard a vessel carrying a large quantity of contraband would be unaware of its presence. The obvious inference of this is that the defendants in this case were aware of contraband aboard the vessel. Nevertheless, the expert left this inference for the jury to draw. He did not expressly "state the inference." Therefore, his testimony did not violate rule 704(b).

United States v. Alvarez, 837 F.2d 1024, 1031 (11th Cir. 1988) (alteration omitted).

In this case, Gonzalez testified that, during the traffic stop, Osgood's hands were visibly shaking, that he had sweat on his forehead even though the air conditioner had been on, and that Osgood avoided making eye contact when

33

speaking with Gonzalez. While this testimony, like the testimony in Alvarez, likely gave rise to an inference that Osgood knew that he was transporting contraband, Gonzalez did not expressly state this inference. Instead, he let the jury draw its own conclusions from this testimony. Thus, Gonzalez's testimony did not violate Rule 704(b).

## C.    Jury Instruction on Deliberate Ignorance

"We apply a deferential standard of review to a trial court's jury instructions." United States v. Puche, 350 F.3d 1137, 1148 (11th Cir. 2003). "Under this standard, we will only reverse if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." Id. (quotations omitted).

We have held that a deliberate ignorance instruction is warranted "only when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991) (quotation and alteration omitted). The "district court should not instruct the jury on 'deliberate ignorance' when the relevant evidence points only to actual knowledge, rather than deliberate avoidance." Id. We have held, however, that

34

instructing the jury on deliberate ignorance is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge. United States v. Kennard, 472 F.3d 851, 858 (11th Cir. 2006), cert. denied, 127 S.Ct. 3004 (2007); United States v. Perez-Tosta, 36 F.3d 1552, 1564 (11th Cir. 1994); United States v. Stone, 9 F.3d 934, 937-42 (11th Cir. 1993); Rivera, 944 F.2d at 1572-73.

In this case, we decline to decide whether the facts at trial supported a deliberate ignorance instruction. This is so because the district court alternatively instructed the jury on a theory of actual knowledge and Gonzalez's testimony was sufficient for a jury to conclude that Osgood had actual knowledge regarding the marijuana in the truck. See Kennard, 472 F.3d at 858 (declining to address whether the evidence justified a deliberate ignorance instruction because "any shortcoming in the evidence about deliberate ignorance was rendered harmless by the sufficiency of the evidence of actual knowledge").

Gonzalez testified that, at the beginning of the traffic stop, Osgood's hands were visibly shaking, that he had sweat on his forehead even though the air conditioner had been on, and that he did not make direct eye contact with Gonzalez when they were speaking. Osgood's passenger, Steed, was also visibly nervous and was breathing heavily, even though he had just been sleeping. A jury could

35

infer from these signs of nervousness that Osgood and his passenger knew that they were transporting contraband. Gonzalez also observed five cellular telephones in the truck, even though Osgood and Steed were the only passengers, thus suggesting that they had knowledge of the drugs and were taking measures to protect the privacy of drug-related communications. Osgood also had a key to the trailer, implying that he had access to and was aware of its contents.

In addition, Osgood provided Gonzalez with shipping papers containing several irregularities, including seal numbers that did not match the seal number on the trailer, the absence of any contact information, and a supposed origin and destination that were inconsistent with the truck's present location. Osgood also provided Gonzalez with a carbon receipt from a truck repair shop in southern California from a few days earlier, and written on the receipt in pen was a seal number matching the seal number on the trailer. Osgood's logbook did not reflect the fact that, according to the shipping papers, the truck had received three loads of cargo a few days earlier, and his logbook was inconsistent with several receipts found in the truck and with the entries in Steed's logbook. These above irregularities in the paperwork suggest that Osgood knew that he was not transporting a legitimate load of cargo and that he actively sought to disguise that fact.

Thus, because the above circumstantial evidence was sufficient for a jury to conclude that Osgood had actual knowledge of the marijuana in the truck, it is unnecessary to determine whether the evidence would have also supported a deliberate ignorance instruction. Therefore, we conclude that any error with respect to the deliberate ignorance instruction was harmless.[14]

## D.    Sentencing Enhancement Based on a Prior Conviction

We review constitutional sentencing issues de novo. United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005). In the context of the Federal Sentencing Guidelines, the Supreme Court in United States v. Booker, 543 U.S. 220, 244, 125 S.Ct. 738, 756, 160 L.Ed.2d 621 (2005) "reaffirm[ed] [its] holding in Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)]: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." The prior-conviction exception derived from the Supreme Court's earlier decision in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that "the government need not allege in its

---

[14] For this reason, we decline to address Osgood's argument that this Circuit's pattern jury instruction on deliberate ignorance violates the separation of powers.

indictment and need not prove beyond a reasonable doubt that a defendant had prior convictions for a district court to use those convictions for purposes of enhancing a sentence." United States v. Marseille, 377 F.3d 1249, 1257 (11th Cir. 2004).

In United States v. Gibson, 434 F.3d 1234, 1246 (11th Cir. 2006), the defendant argued that the prior-conviction exception in Almendarez-Torres was of "questionable force" based on the Supreme Court's subsequent criticism of the decision. However, we observed that "Booker simply restated the rule set forth in Apprendi, including the prior-conviction exception," and, therefore, we were bound to follow Almendarez-Torres until the Supreme Court overruled it. Id. at 1246-47 ("Though wounded, Almendarez-Torres still marches on and we are ordered to follow. We will join the funeral procession only after the Supreme Court has decided to bury it."); accord United States v. Greer, 440 F.3d 1267, 1273 (11th Cir. 2006) ("As we have said several times, unless and until the Supreme Court specifically overrules Almendarez-Torres, we will continue to follow it.").

The defendant in Gibson also argued that, even if we followed Almendarez-Torres, the jury was nonetheless still required to find that his prior convictions were "controlled substance offenses" for purposes of the career offender enhancement in U.S.S.G. § 4B1.2. Id. at 1247. We also rejected that argument,

38

holding that "whether Gibson's prior convictions were felonies involving a controlled substance is a question of law to be answered by the court, not a question of fact to be found by the jury." Id.

In this case, Osgood's sentence was enhanced under 21 U.S.C. § 841(b)(1)(B), providing for a mandatory minimum sentence of 120 months' imprisonment where, inter alia, the defendant is convicted of a controlled substance offense involving 100 kilograms or more of marijuana and has been previously convicted of a "felony drug offense."[15]  21 U.S.C. § 841(b)(1)(B).  The district court adopted the probation officer's finding that Osgood was convicted of a felony drug offense in 2003, and Osgood did not challenge that factual finding at sentencing.

Instead, Osgood argued, as he does on appeal, that this prior conviction was not pled or proven at trial and, therefore, could not trigger an enhanced sentence under § 841(b)(1)(B).  This argument, however, is foreclosed by our holding in Gibson that the prior-conviction exception of Almendarez-Torres remains binding precedent.  434 F.3d at 1246-47.

Osgood also argues on appeal that a jury was required to find that his prior

_____

[15]  Without this prior-conviction enhancement, Osgood's statutory minimum would have been 5 years' imprisonment and, therefore, his applicable guideline range would have remained 92 to 115 months' imprisonment.

conviction constituted a felony drug offense within the meaning of § 841(b)(1)(B).

However, this argument is again foreclosed by Gibson, which held that it is a question of law for a judge as to whether a prior conviction triggers a sentencing enhancement. Id. at 1247.

Finally, Osgood's reliance on the Supreme Court's decision in Shepard v. United States, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 705 (2005) is misplaced because that decision did not overrule Almendarez-Torres. United States v. Camacho-Ibarquen, 410 F.3d 1307, 1316 n.3 (11th Cir. 2005) ("Although recent decisions, including Shepard . . . , may arguably cast doubt on the future prospects of Almendarez-Torres's holding regarding prior convictions, the Supreme Court has not explicitly overruled Almendarez-Torres. As a result, we must follow Almendarez-Torres."). Accordingly, we reject Osgood's sentencing argument.

## III.

Based on the reasons set forth above, we render the following conclusions. First, the district court did not err by denying Osgood's motion to suppress. Second, the district court did not abuse its discretion in connection with Gonzalez's expert testimony. Third, the district court did not commit reversible error by instructing the jury on a theory of deliberate ignorance. Fourth, and finally, the district court did not violate Osgood's Sixth Amendment rights at sentencing.

40

Accordingly, we affirm Osgood's conviction and sentence.

**AFFIRMED.**