[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-13341
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cr-00428-LMM-RGV-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MELVIN GOODE WENTT,
a.k.a. Melvin Goode,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(September 17, 2020)

Before NEWSOM, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Melvin Goode Wentt appeals his convictions for bank fraud, 18 U.S.C. § 1344, and conspiracy to commit bank fraud, 18 U.S.C. § 1349. He contends the district court erred in giving a deliberate-ignorance jury instruction. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Financial institutions generally offer smaller loans and charge higher interest rates for personal loans, as opposed to automobile loans, due to the lack of collateral (the collateral in an automobile loan being the title of the car). Sometime in 2015 or 2016, Wentt's longtime friend, Giovanni Cartier, approached Wentt with an eight-step plan—what he called an "auto loan conversion"—to get people the benefits of an automobile loan without having to provide collateral. Cartier described to Wentt the plan as follows: (1) create a fake car dealership (that did not have cars, a car lot, a dealer license, or employees); (2) locate vehicles for sale on websites; (3) forge purchase orders and titles for the vehicles; (4) persuade people to apply for automobile loans with different financial institutions using these fraudulent purchase orders; (5) apply to financial institutions providing, when needed, fraudulent income verification documents; (6) upon approval of the loan, deposit the check from the bank in a bank account in the sham car dealership's name; (7) give the dealership a "ten to [twenty] percent" commission as a "back-end fee" while distributing the remainder of the money to the loan recipient; and (8) if the financial institution contacted the loan recipient to provide the vehicle's title as collateral, instruct the

2

person to tell the financial institution that he or she decided not to buy the car and that the dealership gave him or her their money back. Cartier told Wentt that the dealership would have no cars and that they would need to lie to financial institutions to get the loans. Knowing the full "ins and outs" of the scheme, Wentt asked if he could "get in," and Cartier agreed. Wentt thus became a "partner" in the fraudulent scheme.

For his involvement, Wentt was charged with two counts of bank fraud and one count of conspiracy to commit bank fraud. His trial strategy included proving a lack of knowledge—specifically, that he did not know his actions were illegal because Cartier told him that the plan was a loophole in the law and therefore legal.

Wentt's involvement in the conspiracy included being named the manager of the bogus dealership on the articles of organization. As manager, he opened a company bank account that was used to deposit the checks received from the financial institutions. Wentt permitted Cartier to sign and deposit checks in Wentt's name. According to Cartier, while he signed and deposited the checks "99.9 percent of the time," during those rare occasions that he did not deposit the checks, Wentt would deposit the checks. Wentt exchanged emails with Cartier concerning bank accounts, client information, loan approval updates, and fraudulent documents that needed to be submitted with the loan applications. In some of the emails, Cartier would attach fraudulent "purchase orders" for cars. In one email, Wentt told Cartier

3

that he wanted to "maximize the loan amount" for a loan applicant. Cartier explained that maximizing a loan amount entailed "upping [the loan applicant's] salaries to offset their debt."

Wentt also actively recruited loan applicants. One of those loan applicants, Michael Amador, testified that he sought a loan of $100,000 for a business venture. After they talked on the phone, Amador submitted a loan application to Wentt. Amador was under the impression Wentt was a representative of a financial institution. But to his surprise, he received several phone calls and emails from financial institutions stating that he had been approved for loans that he had not applied for. One institution notified Amador that he had been approved for a $75,000 automobile loan. Amador asked Wentt why he had been approved for an automobile loan when he did not wish to purchase a vehicle. Wentt replied, "[T]hat's how we're piecing together your hundred thousand dollars." "[Wentt and his affiliates] would get the car loan," Amador continued, "then . . . put it through one of their car dealerships in their portfolio and . . . cash [Amador] out." Uncomfortable with that plan, Amador declined to move forward with the application.

At trial, Wentt twice objected to the government's proposed instruction on deliberate ignorance as proof of knowledge, arguing that the evidence only presented an actual-knowledge theory of culpability. In response, the government argued that,

4

while there was evidence of actual knowledge, there was also evidence that Wentt was deliberately ignorant and cited examples: Wentt allowed Cartier to control his email and mailing address and gave Cartier access to his "passwords" and "authentication information" "in order to conduct transactions." The district court overruled Wentt's objections and instructed the jury on actual knowledge and deliberate ignorance. After a week-long trial, the jury found Wentt guilty on all counts, and the district court sentenced him to thirty-four months' imprisonment. This is his appeal.

## DISCUSSION

Wentt argues that the district court erroneously instructed the jury on deliberate ignorance because: (1) Cartier told Wentt that the scheme was a "loophole" and legal; and (2) Wentt did not create any fraudulent or false documents.

We review de novo a challenge to a deliberate-ignorance instruction. United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993). "Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts . . . ." United States v. Williams, 526 F.3d 1312, 1320 (11th Cir. 2008) (internal quotation marks omitted). "Under this standard, we will only reverse if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." United States v. Puche, 350 F.3d 1137, 1148 (11th Cir. 2003) (internal quotation marks omitted).

5

To convict Wentt of bank fraud, the government had to establish that Wentt "knowingly execute[d], or attempt[ed] to execute, a scheme or artifice . . . to defraud a financial institution." United States v. De La Mata, 266 F.3d 1275, 1287 (11th Cir. 2001). And to convict Wentt of conspiracy to commit bank fraud, the government had to prove that Wentt "knowingly . . . joined [the conspiracy]." United States v. Moran, 778 F.3d 942, 960 (11th Cir. 2015). "[T]he knowledge element of a violation of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance." United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000); see also United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) ("This Court has consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge." (internal quotation marks omitted)).

A deliberate-ignorance instruction is proper when "the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Steed, 548 F.3d 961, 977 (11th Cir. 2008) (internal quotation marks omitted). However, a deliberate-ignorance instruction is improper "when the relevant evidence points only to actual knowledge, rather than deliberate avoidance." Id. (internal quotation marks omitted). Nevertheless, we have repeatedly held that "instructing the jury on deliberate ignorance is harmless error where the jury was also instructed and could

6

have convicted on an alternative, sufficiently supported theory of actual knowledge."

Id.; see, e.g., Stone, 9 F.3d at 937 ("Even if we accept [the defendant's] characterization of the evidence and assume that there was no evidence of deliberate ignorance, reversal is not required because any error in giving the instruction was harmless beyond a reasonable doubt.").[1]  In determining if the jury could have convicted a defendant on a theory of actual knowledge, we look to "the sufficiency of the evidence of actual knowledge." United States v. Kennard, 472 F.3d 851, 858 (11th Cir. 2006).  We must view the evidence in the light most favorable to the government and draw all reasonable inferences from the evidence in favor of the jury's verdict.  See United States v. Thomas, 676 F.2d 531, 535 (11th Cir. 1982).

We need not decide whether the district court erred in instructing the jury on a theory of deliberate ignorance because the district court alternatively instructed the jury on a theory of actual knowledge, and there was sufficient evidence presented at trial for the jury to conclude that Wentt had actual knowledge of the fraudulent scheme.  The evidence showed that Wentt was a full-fledged partner in this scheme, who not only was passively apprised of the illegal activities of the fraud, but also actively participated.  Aside from the correspondence between Cartier and Wentt describing the inner-workings of the fraud scheme, Wentt recruited loan applicants,

---

[1] Wentt argues that our harmless error precedent is wrong, erroneous, and harmful, but we are bound by it until it is overruled by the en banc court or the Supreme Court. See United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008).

7

deposited fraudulent checks, and allowed his own bank account to be used to deposit fraudulent checks. Cartier testified that he explained to Wentt how the scheme worked. In particular, he explained to Wentt "how they would need to lie to banks and credit unions" to obtain favorable financing.

Wentt's argument that he did not file or create any fraudulent documents is refuted by the record. Wentt, on at least one occasion, created and tried to file fraudulent documents. Amador testified that Wentt tried to persuade him to file a fraudulent loan application. Wentt's other argument—that Cartier told him that the scheme was a loophole and, therefore, legal—is also contradicted by the record. Cartier testified that he never told Wentt that "it was legal to lie to a bank or a credit union"; rather, he told Wentt that the scheme was a "loophole in the rules," meaning that "the banks never checked the validity of the companies that [the co-conspirators] established." Pointing out a way to avoid a bank's detection of a fraud is not the equivalent of not knowing the legality of that fraud.

The evidence showed that, at minimum, Wentt had "actual knowledge" that what he and his co-conspirators were doing was illegal. Because the government presented sufficient evidence of Wentt's "actual knowledge" that independently supported his conviction beyond a reasonable doubt, any error in the district court's deliberate-ignorance instruction was harmless. See Stone, 9 F.3d at 939–42 (holding that an error in a district court's deliberate-ignorance instruction is harmless when

8

there is evidence "sufficient to support a conviction on one theory (actual knowledge) but insufficient to support a conviction on the other theory (deliberate ignorance)").

**AFFIRMED.**