[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-14556
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cr-20426-RAR-1


UNITED STATES OF AMERICA,



Plaintiff-Appellee,

versus

GEORVANYS RODRIGUEZ PINEDA,



Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 20, 2021)

Before LUCK, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

Georvanys Rodriguez Pineda appeals his convictions for healthcare fraud and conspiracy to commit healthcare and wire fraud. Pineda argues that the district court erred by giving a deliberate ignorance jury instruction and by admitting Federal Rule of Evidence 404(b) evidence of Pineda's relationship with an unrelated healthcare fraudster. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Pineda was indicted for health care fraud, in violation of 18 U.S.C. section 1347, and conspiracy to commit healthcare and wire fraud, in violation of 18 U.S.C. section 1349. The indictment alleged that Pineda defrauded Medicare's Limited Income Newly Eligible Transition program. The LINET program is a "safety net" that provides temporary coverage to Medicaid-eligible beneficiaries who are newly eligible for Medicare Part D but haven't yet enrolled in a Part D plan. This ensures that beneficiaries can receive their medications without interruption until they transition into a Part D plan.

### The Fraud at Urantia Pharmacy

The pharmacy fraud at the heart of this case was the brainchild of Pablo Garcia Menendez. At the time of Pineda's trial, Menendez was on the lam facing charges in two separate healthcare fraud cases (both involving pharmacy fraud). Pineda was

2

Menendez's handyman.  According to Maria Estrada, Menendez's ex-wife, Pineda also ran "errands" for Menendez, including cashing checks to launder the proceeds of illegal prescription drug sales.

Menendez had previously served time in prison for healthcare fraud involving durable medical equipment.  He returned to healthcare fraud when he was released, this time involving pharmacies.  But Menendez couldn't operate a pharmacy in his own name because of his prior conviction for healthcare fraud.  Estrada testified that Menendez recruited other people to become the registered owners of his fraudulent pharmacies in exchange for a cut of the profits.

The fraud at Urantia Pharmacy began after Menendez discovered that the LINET program was especially vulnerable to fraud.  He learned that he didn't need a patient's name or a prescription to submit claims to the program.  All he needed was a beneficiary's identification number and a doctor's name.  Menendez's coconspirators in the Urantia Pharmacy fraud scheme included Pineda, Estrada (Menendez's ex-wife), and Juan Carmenate, a pharmacy technician who helped Menendez with the technical aspects of pharmacy fraud.

Estrada testified that Pineda agreed to become the nominal owner of Urantia Pharmacy in exchange for Menendez paying him $8,000 a month.  Estrada prepared the bill of sale for Pineda's purchase of Urantia Pharmacy. Pineda enrolled with the Florida Department of Health as Urantia Pharmacy's owner and transferred the

3

pharmacy's National Provider Identifier number to his name. Estrada testified that Pineda willingly did these acts "[w]ith full knowledge" that Urantia Pharmacy was a fraud. He did so, Estrada explained, "[t]o make money." Estrada testified that Menendez paid Pineda for his role with Urantia Pharmacy in cash because it wasn't traceable.

Carmenate confirmed that Pineda agreed to become Urantia Pharmacy's owner "for the money." Carmenate testified that he discussed the Urantia Pharmacy fraud with Menendez in Pineda's presence.

Urantia Pharmacy used software called Abacus to submit its LINET claims to Medicare. Pineda's name and phone number were on Urantia Pharmacy's application to obtain the Abacus software, and his daughter signed the application on his behalf. Pineda paid for Abacus on a monthly basis through his personal bank account. Abacus's contract with Urantia Pharmacy became effective on June 10, 2015.

Urantia Pharmacy was a "phantom pharmacy" under Pineda's ownership. It didn't purchase medication, it didn't have customers, and its shelves were empty. Urantia Pharmacy's prescription department was never open because it didn't employ a pharmacist. No legitimate pharmacy operations ever took place at Urantia Pharmacy. The only person working in the pharmacy was Pineda's daughter who,

Estrada explained, "was just there waiting" every day in case the government came by to inspect the pharmacy.

But Urantia Pharmacy still managed to rake in plenty of money. Pineda owned Urantia Pharmacy from June 15, 2015 until August 20, 2015. From June 11, 2015 through August 1, 2015, Urantia Pharmacy submitted over $1,111,000 worth of claims to Medicare and received over $310,000 in reimbursements. Carmenate submitted Urantia Pharmacy's first billing on June 11 using a list of drugs, doctors, and patient identification numbers that Menendez gave him.

On June 30, Pineda opened an account for Urantia Pharmacy at a check cashing store. This account allowed him—but no one else—to cash checks on the pharmacy's behalf. That same day, a Medicare reimbursement check worth $41,485.23 made out to Urantia Pharmacy was cashed at the store. This check was for the claims Urantia Pharmacy submitted on June 11. Pineda endorsed the check and his thumbprint was on it.

There were several unusual things about Urantia Pharmacy's billing practices under Pineda's ownership. The pharmacy only billed Medicare through the LINET program, only billed for uncommon and "very expensive" drugs, and only had "a few beneficiaries"—almost all of them from out of state—billing "for all of these medications." Because these red flags were "consistent with fraud," Medicare investigators zeroed in on Urantia Pharmacy. In August 2015, Medicare halted

5

further payments to Urantia Pharmacy after it had already paid over $310,000.  On August 20, 2015, Pineda stepped down as the pharmacy's owner and someone else took over.  The Urantia Pharmacy fraud ended that same month.

*The Rule 404(b) Evidence About Andy Armas*

The government put Pineda on notice prior to trial that it intended to introduce rule 404(b) evidence about his role in a money laundering operation involving his coconspirators from the Urantia Pharmacy scheme.  Pineda objected to this proffered evidence.  The district court ruled that the government's rule 404(b) evidence was admissible.

Special Agent Eddie Calienes, a healthcare fraud investigator with the Department of Health and Human Services, testified at trial that Pineda was involved in a multimillion-dollar money laundering scheme involving check cashing stores and his coconspirators from Urantia Pharmacy.  The district court gave the jury a cautionary instruction about the permissible uses of this evidence during Special Agent Calienes's testimony.  The district court later gave the circuit's pattern cautionary instruction for similar acts evidence at the close of trial.

Special Agent Calienes testified that two of the checks Pineda cashed were from Marlin's Pharmacy and were signed by Andy Armas.  Special Agent Calienes testified that Armas owned Marlin's Pharmacy,  had been convicted of healthcare fraud, and had introduced Pineda to his coconspirators in the Urantia Pharmacy

scheme.  Pineda objected that testimony about Armas's prior conviction and relationship with him had no probative value and was "gratuitous" and unfairly prejudicial.  The district court overruled Pineda's objection.

Estrada testified without objection that Menendez met Pineda through Armas.  She also testified, again without objection, that Armas was "in federal prison for healthcare fraud."  Estrada provided Menendez's cellular telephone to Special Agent Calienes, which Menendez had left behind after he fled.  One of the phone's contacts matched Pineda's number and was listed as "El Chino socio de Andy."  Special Agent Calienes explained that "El Chino" was Pineda's nickname and "socio de" meant "associate of."

*Pineda's Defense*

Pineda denied at trial that he knew about the fraud at Urantia Pharmacy.  The defense theory was that he "wasn't in on it," "did not know" about the fraudulent conspiracy, and had been "duped" by Menendez.

Pineda testified consistently with this defense.  He explained that he was just Menendez's handyman.  Menendez one day offered to buy him a pharmacy, which would provide "a good income."  Pineda initially wasn't sure because he didn't "know anything about pharmacies."  But Menendez had a friend selling a pharmacy "at a good price," and they went to take a look at it.  The pharmacy—Urantia—was in "pretty good shape," so Pineda signed the bill of sale then and there.

7

Pineda testified that he soon sold Urantia Pharmacy because getting it ready was taking too long and he didn't understand the business. He testified that he went to Urantia Pharmacy just once and knew nothing about Abacus or the LINET program. At the time of his arrest, Pineda believed it was impossible for Urantia Pharmacy to have billed Medicare, he testified, because the pharmacy was empty. Pineda maintained at trial that Menendez never talked to him about committing fraud.

*The Deliberate Ignorance Instruction*

The district court, over Pineda's objection, gave the jury the circuit's pattern deliberate ignorance instruction. This instruction provided:

> If a defendant's knowledge of a fact is an essential part of the crime, it's enough that the defendant was aware of a high probability that the fact existed—unless the defendant actually believed the fact didn't exist.
>
> So, with respect to the issue of the Defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the Defendant believed he participated in a scheme or artifice to defraud Medicare and the LINET program, and deliberately and consciously tried to avoid learning that there was a scheme or artifice to defraud Medicare and Medicare drug plan sponsors, in order to be able to say, if apprehended, that he was unaware of the scheme to defraud Medicare and the LINET program, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.
>
> In other words, you may find that the Defendant acted "knowingly" if you find beyond a reasonable doubt either: (1) that the Defendant actually participated in a scheme or artifice to defraud a health care benefit program; or (2) that he deliberately closed his eyes to what []he had every reason to believe was the fact.

8

I must emphasize, however, that the requisite proof of knowledge on the part of the Defendant cannot be established by merely demonstrating that the Defendant was negligent, careless or foolish.

During deliberations, the jury sent the following note: "Does the fact that the defendant claims that he had <u>no knowledge</u> of 'healthcare benefit program' as specified by the [the knowledge element of healthcare fraud] super[s]ede page 19 '[d]eliberate [i]gnorance' as [p]roof of [k]nowledge?" The district court responded, with the agreement of the parties, "No it does not. All the jury instructions must work together. One instruction does not supersede another. Please carefully read both instructions."

The jury then found Pineda guilty of healthcare fraud and conspiracy to commit healthcare and wire fraud. The district court sentenced him to seventy months in prison. Pineda now appeals his convictions.

## STANDARDS OF REVIEW

We review de novo whether the district court misstated the law in its jury instructions. United States v. Joseph, 709 F.3d 1082, 1093 (11th Cir. 2013). We review the admission of evidence under rule 404(b) for an abuse of discretion. United States v. Lampley, 68 F.3d 1296, 1299 (11th Cir. 1995).

9

## DISCUSSION

Pineda argues that the district court erred by:  (1) giving the deliberate ignorance instruction, and (2) admitting rule 404(b) testimony about his relationship with Armas.

*The Deliberate Ignorance Instruction*

Pineda argues that the district court erred by giving the deliberate ignorance instruction because the evidence established only that he acted either with actual knowledge or no knowledge of the fraud at Urantia Pharmacy.[1]

We "consistently" have recognized "deliberate ignorance of criminal activity as the equivalent of knowledge."  United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) (quotation omitted).  Deliberate ignorance occurs when "a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance . . . ."  United States v. Rivera, 944 F.2d 1563, 1570 (11th Cir. 1991) (quotations omitted).  A deliberate ignorance instruction is appropriate where the facts "support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to

---

[1] Pineda also argues in his reply brief that the deliberate ignorance instruction did not differentiate between the conspiracy count and the substantive counts.  "[T]he rule requiring that issues be raised in opening briefs is well-established."  United States v. Ardley, 273 F.3d 991, 991 (11th Cir. 2001) (Carnes, J., concurring in the denial of rehearing en banc).  Because this issue was not raised in his initial brief, Pineda has waived it.  See, e.g., United States v. Levy, 379 F.3d 1241, 1244 (11th Cir. 2004) ("[T]his Court . . . repeatedly has refused to consider issues raised for the first time in an appellant's reply brief.").

10

avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." Id. at 1571 (quotation omitted). Where "the evidence could support both actual knowledge or deliberate ignorance," the district court may instruct the jury on both methods of establishing the defendant's knowledge. See, e.g., United States v. Maitre, 898 F.3d 1151, 1157 (11th Cir. 2018).

Here, there was evidence, most of which came from Pineda himself, that Pineda was aware of a high probability that Urantia Pharmacy was a fraud and purposely avoided learning more. See United States v. Calhoon, 97 F.3d 518, 533 (11th Cir. 1996) (explaining that the defendant's own testimony can be used to establish deliberate ignorance). Pineda testified that: Menendez offered to buy Urantia Pharmacy for him, even though he was "totally ignorant of pharmacies" and had no money to contribute to the purchase; he accepted the offer, even though Menendez was "sleazy" and "slimy"; he didn't know how much Menendez paid for Urantia Pharmacy (Menendez assured him that the pharmacy's price was "just peanuts") or how much profit the pharmacy would bring in, even though he was responsible for paying Menendez back; his daughter worked at Urantia Pharmacy, even though the pharmacy was empty and had no customers; Urantia Pharmacy received a reimbursement check for $41,485.23 two weeks after he became its owner, even though the pharmacy was not yet operational; and he endorsed this

11

check, even though he claimed to believe that the money belonged to Urantia Pharmacy's previous owner.

Pineda, also, denied knowing about the Abacus software and claimed he only learned about it at trial, even though Urantia Pharmacy paid for the software on a monthly basis through Pineda's own bank account and the Abacus account was in his name. He denied signing the application to obtain the Abacus software or authorizing his daughter to sign it on his behalf, even though the application included a voided check from his checking account. Pineda was aware that he was being billed for expenses related to the pharmacy but claimed he didn't know what these bills were for because Menendez "never explained that to [him]" and assured him that "all pharmacies had to do that." Finally, Pineda acknowledged that he repeatedly cashed checks for large sums of money on Menendez's behalf, explaining that Menendez said that he worked for the police and Pineda believed he was assisting Menendez in an undercover "investigation" to "nab someone who was doing something bad." Pineda admitted he did not know where the money funding Menendez's "investigation" came from.

These facts all support the inference that Pineda purposely avoided learning about the fraud at Urantia Pharmacy. See Rivera, 944 F.2d at 1571 (explaining that the deliberate ignorance instruction is warranted where the defendant "purposely avoided learning all the facts necessary to obtain positive knowledge"); Maitre, 898

12

F.3d at 1157 (concluding there was sufficient evidence of deliberate ignorance in identity theft case where the defendant accepted fifteen to twenty purses from her boyfriend as gifts—some containing "other people's wallets and IDs"—even though she "knew he didn't have a job"). Thus, the district court did not err in instructing the jury on deliberate ignorance.

Even if the district court erred in giving the deliberate ignorance instruction, the error was harmless. "Instructing the jury on deliberate ignorance is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge." United States v. Steed, 548 F.3d 961, 977 (11th Cir. 2008); United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993) (holding that an erroneous deliberate ignorance instruction is harmless where the jury is instructed that deliberate ignorance requires "proof beyond a reasonable doubt," and there is "sufficient" evidence of actual knowledge, even if that evidence is not "overwhelming").

The harmless error standard laid out by Steed and Stone is satisfied here. In addition to the deliberate ignorance instruction, the jury was instructed on actual knowledge. And there was sufficient proof that Pineda had actual knowledge of the fraud at Urantia Pharmacy. Estrada testified that Pineda became Urantia Pharmacy's owner "[w]ith full knowledge" of the fraud and did so "[t]o make money." Carmenate testified that he discussed the Urantia Pharmacy fraud with Menendez in

Pineda's presence. Because the evidence "was sufficient for a jury to conclude that [Pineda] had actual knowledge" of the healthcare fraud at his pharmacy, "we conclude that any error with respect to the deliberate ignorance instruction was harmless." See Steed, 548 F.3d at 978.

Pineda argues that the jury question about the deliberate ignorance instruction shows that it had a confusing and misleading effect. But Pineda agreed with the district court's response, which directed the jury to consider the instructions as a whole and to read them carefully. Because we presume that "juries obey the court's instructions," Stone, 9 F.3d at 938, the district court's accurate response to the jury's question—given with Pineda's approval—doesn't alter our conclusion that the error, if any, was harmless.

### *The Rule 404(b) Evidence About Armas*

The district court ruled that evidence of Pineda's participation in a money laundering scheme with his coconspirators from Urantia Pharmacy was admissible under rule 404(b). Special Agent Calienes testified about this scheme and explained that Pineda met Menendez through Armas, a convicted healthcare fraudster. The district court overruled Pineda's objection to this testimony, concluding that

14

Armas's connection to Pineda was relevant and helped "connect the dots to the whole case."

Pineda now argues that the district court erred by allowing the government to elicit testimony that Armas was his associate and had been convicted of healthcare fraud. He does not contest that this rule 404(b) evidence was relevant to an issue other than his character and supported by a preponderance of the evidence. Pineda only argues that under rule 403 this evidence was "egregious[ly]" prejudicial because it risked a finding of "guilt by association."

A three-part test governs the admissibility of rule 404(b) evidence:

> First, the evidence must be relevant to an issue other than the defendant's character; [s]econd, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; [t]hird, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of [r]ule 403.

United States v. Delgado, 56 F.3d 1357, 1365 (11th Cir. 1995). Only the third prong is at issue here. The exclusion of probative evidence is an "extraordinary remedy" that should be used "sparingly." United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003) (quotations omitted). We conclude that the district court did not abuse its discretion in allowing evidence about Pineda's relationship with Armas.

First, the evidence of Pineda's relationship to Armas was significant—probative—to the government's case. This evidence explained how Pineda met his coconspirators and therefore was relevant to show the origins of the fraud at Urantia

15

Pharmacy.  See United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005) (explaining that rule 404(b) evidence was probative because it established how the coconspirators met prior to the charged crime).

This evidence also corroborated Estrada's testimony, one of the government's key witnesses.  Estrada testified that Pineda met Menendez through Armas.  She provided Menendez's cellphone to the government, which listed Pineda as a contact and "socio de" (i.e. associate of) Armas.  See United States v. McLean, 138 F.3d 1398, 1405 (11th Cir. 1998) ("[T]he purpose of [the rule 404(b)] evidence was not to attack McLean's character but to corroborate the confidential informants' testimony about" the charged crime).  It was also probative to "rehabilitate [Estrada's] credibility" by rebutting any argument that she was falsely testifying against Pineda to get a reduced sentence.  See United States v. Henderson, 409 F.3d 1293, 1304 (11th Cir. 2005) ("[T]he government proffered [rule 404(b)] evidence not to show Henderson's bad character . . . but instead to rehabilitate the credibility of Detective Bennett, whom Henderson had impeached . . . .").

Second, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.  The jury knew that Pineda worked for Menendez, who had a lengthy history with different types of healthcare fraud and had fled the jurisdiction because of his pending charges for healthcare fraud.  Because it was

16

undisputed that Pineda had an extensive relationship with an experienced fraudster, a passing reference to another fraudster didn't tip the prejudice scale substantially.

The jury also knew that Pineda was associated with other people involved in healthcare fraud. Estrada and Carmenate both admitted to their involvement in the Urantia Pharmacy fraud scheme. The jury knew that both cooperating witnesses had been charged with healthcare fraud, had pleaded guilty to committing healthcare fraud, and were serving prison sentences for their roles in healthcare fraud. Pineda's involvement with these convicted healthcare fraudsters further diminished any unfair prejudice caused by the rule 404(b) evidence about his involvement with yet another convicted healthcare fraudster.

The evidence about Armas was also not a major feature of the trial. The government's case took place over three days, included multiple documents implicating Pineda in the fraud at Urantia Pharmacy (like the Abacus software application and the $41,485.23 check Pineda endorsed), and relied on six witnesses. Only two of them mentioned Armas. The testimony of the government's witnesses encompasses 289 pages of the transcript, and Special Agent Calienes and Estrada's discussion about Armas spans a mere six. The small part this testimony played at trial showed that the probative value of the rule 404(b) evidence was not substantially outweighed by the danger of unfair prejudice. See United States v. Mathews, 431 F.3d 1296, 1309 (11th Cir. 2005) (concluding that the probative value

17

of rule 404(b) evidence was not substantially outweighed by the danger of unfair prejudice where the rule 404(b) evidence consisted of a "brief conversation" about drugs, and other conspirators had "testified to substantial personal use of cocaine, marijuana, and ecstasy").

Finally, the district court took affirmative steps to mitigate any unfair prejudice caused by the rule 404(b) evidence. During Special Agent Calienes's testimony, the district court gave the jury a limiting instruction about the rule 404(b) evidence and told the jury "to be very mindful" to "not consider this evidence to decide" if Pineda "engaged in the activity alleged in the indictment." In its final instructions to the jury, the district court gave the circuit's pattern limiting instruction for rule 404(b) evidence. These instructions reduced the risk of unfair prejudice to Pineda. See United States v. Ellisor, 522 F.3d 1255, 1268 (11th Cir. 2008) ("[T]he 'scalpel' of an appropriate limiting instruction at the time [rule 404(b)] evidence [is] admitted can reduce the risk of inherent prejudice . . . ."); United States v. Edouard, 485 F.3d 1324, 1346 (11th Cir. 2007) ("[A]ny unfair prejudice possibly caused by admitting evidence of Edouard's prior smuggling activities was mitigated by the district court's limiting instruction to the jury.").

In light of the importance of the rule 404(b) evidence to the government's case; the fact that the jury knew Pineda was associated with other convicted healthcare fraudsters like Menendez, Estrada, and Carmenate; and the limiting

18

instructions given by the district court, we cannot conclude that the district court abused its discretion by ruling that the probative value of the rule 404(b) evidence was not substantially outweighed by any undue prejudice.

**AFFIRMED**.